**NATIONAL ACCEPTANCE COMPANY OF AMERICA, a Delaware Corporation, and Mitsubishi International Corporation, a New York Corporation, Plaintiffs,**

v.

**VIRGINIA CAPITAL BANK, a Virginia banking corporation, Defendant.**

Civ. A. No. 79–0630–R.

United States District Court, E. D. Virginia, Richmond Division.

Aug. 8, 1980.

On Motion to Amend Judgment Oct. 7, 1980.

See also, D.C., 491 F.Supp. 1269.

2. Since the above discussion totally resolves this case, judgment will be entered in defend-ant's favor even though she has not moved for summary judgment as yet.

Charles F. Witthoefft, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., for National Acceptance.

Robert A. Pustilnik, Samuel & Pustilnik, Richmond, Va., for Mitsubishi.

Alexander N. Simon, Wallerstein, Goode & Dobbins, Richmond, Va., for defendant.

## OPINION AND ORDER

CLARKE, District Judge.

This diversity action was brought pursuant to 28 U.S.C. § 1332 by two creditors of Concrete Structures, Inc., a Virginia corporation recently the subject of bankruptcy proceedings under Chapter XI of the Bankruptcy Act. Claiming a prior, perfected security interest in certain funds deposited in several deposit accounts maintained by Concrete Structures in the Virginia Capital Bank, the plaintiffs allege that the Bank unlawfully appropriated these funds to set-off certain debts owed to the Bank by Structures. Evidence was submitted by the parties in support of their various positions at a hearing held before this Court on June 19, 1980, and the matter is ripe for a determination on the merits. The following opinion represents the Court's findings of fact and conclusions of law under *Fed.R. Civ.P.* 52(a).

Although certain facts relating to this controversy were recited by the Court in a previous Order denying the Bank's motion for summary judgment, 491 F.Supp. 1269 (1980), a more complete picture of the circumstances surrounding this case can now be drawn. Concrete Structures, Inc. was at all relevant times engaged in the business of manufacturing and distributing concrete blocks and prestressed concrete building materials. Beginning in 1964, National Acceptance Company of America (NAC), a Delaware corporation, lent Structures various amounts of money pursuant to certain loan and security agreements and other financing documents. A significant portion of these loans were made as part of an accounts receivable financing arrangement whereby NAC agreed to lend Structures a certain percentage of the face amount of Structures' accounts receivable. NAC reserved the right reasonably to reject unsound accounts which might be tendered by Structures for financing, and took a security interest in the financed accounts and in other collateral. For its part, Structures was obligated to submit all payments received from customers in payment of any account financed under this arrangement directly to NAC.

During the period January 1, 1978, to June 30, 1978, NAC continued to lend money pursuant to these financing arrangements. These transactions were governed by a Loan and Security Agreement dated January 5, 1973; an Extension Agreement dated October 1, 1976, which extended payments on certain outstanding loans; an Accounts Rider dated November 18, 1977; and an Inventory Rider dated November 18, 1977. Under the Loan and Security Agreement, Structures granted NAC a security interest in the following collateral to secure loans made under these agreements:

(a) existing and future accounts, chattel paper, contract rights and instruments (sometimes hereinafter individually and collectively referred to as "Accounts"), whether Accounts are acceptable or unacceptable to Lender and whether Accounts are scheduled to Lender on Schedules of Accounts or not, and all goods whose sale, lease or other disposition by Borrower has given rise to any Accounts and which goods have been returned to or repossessed or stopped in transit by Borrower;

(b) presently owned and hereafter acquired inventory ("Inventory");

(c) presently owned and hereafter acquired general intangibles, goods (other than Inventory), equipment, vehicles and fixtures, together with all accessions, parts and appurtenances thereto appertaining or attached or kept or used or intended for use in connection therewith and all substitutions, renewals, improvements and replacements of and additions thereto (sometimes hereinafter individually and collectively referred to as "Equipment") and all Equipment described in Equipment Rider attached hereto;

(d) presently owned and hereafter acquired Inventory evidenced by warehouse receipts (whether negotiable or non–negotiable) now or at any time or times hereafter issued by any bailee in Lender's name or negotiated to Lender evidencing such bailee's possession of any Inventory now or at any time or times hereafter deposited with such bailee;

and all proceeds and products of and accessions to all of the foregoing described properties and interests in properties.
. . .

It is agreed that this security interest was duly perfected and remained so throughout all relevant times. As of June 1978, when Structures instituted bankruptcy proceedings, Structures was indebted to NAC in an amount exceeding the funds in dispute in this action, under the various financing arrangements governed by the Loan and Security Agreement and related documents.

At the time it instituted bankruptcy proceedings, Structures also was indebted to the other plaintiff in this action, Mitsubishi International Corporation. For some period prior to April 1976, Mitsubishi had been selling steel products to Concrete Structures on open account. Concrete Structures fell behind in its payments on this account and in April 1976, it issued a note promising to pay Mitsubishi the sum of $210,415.20 by July 23, 1976, according to a schedule of payments established in the note. However, Concrete Structures soon failed to meet this schedule of payments and on June 1, 1976, Concrete Structures and Mitsubishi entered into a security agreement to secure "payment and performance of all liabilities and obligations of [Concrete Structures] to [Mitsubishi] of any kind and description, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising and howsoever evidenced or acquired and whether joint, several or joint and several...." Under this security agreement, which was duly perfected by the recording of a financing statement, Mitsubishi acquired a security interest in:

(a) Debtor's inventory including all goods and merchandise, raw materials, goods in process, finished goods, goods in transit now owned or hereafter acquired and the proceeds thereof.

(b) Debtor's accounts receivable and notes receivable and contract rights including all sais [sic] accounts [sic] receivable and notes receivable and contract rights outstanding as of this date and all future accounts receivable and notes receivable, and contract rights and proceeds thereof.[1]

As of June 30, 1978, Structures remained indebted to Mitsubishi in the amount of $278,298.65, exclusive of interest.

In December 1977, Concrete Structures opened several deposit accounts with Virginia Capital Bank, including accounts 010–716–6 and 010–722–0, the two accounts at issue in this litigation. Thereafter, on March 21, 1978, the Bank loaned Concrete Structures $40,249.92, payable in installments over a two–year period. The Bank took as security nineteen vehicles listed in an accompanying security agreement. On

---

1. In a later subordination agreement between Mitsubishi and the other plaintiff, National Acceptance Company of America (NAC), Mitsubishi's security interest in inventory and in accounts and contract rights, both present and future, arising from the sale of concrete blocks manufactured by Concrete Structures was subordinated to NAC's security interest. This subordination agreement was entered into in October 1977 and was perfected on December 8, 1977.

April 4, 1978, the Bank made a demand loan of $12,000 to Concrete Structures. This loan was unsecured. A third loan, in the amount of $50,000, was made by the Bank on or about April 27, 1978,[2] to refinance an outstanding loan previously made to Concrete Erectors, Inc., a subsidiary of Structures. The Bank concedes that, although this April 27 loan ostensibly was secured by an interest in the accounts receivable of Concrete Erectors, this security interest was never perfected.

Almost immediately Structures encountered difficulty in meetings its obligations to the Bank under the terms of these loans. Beginning on June 1, 1978, Structures' impending insolvency became apparent, and without notice to or the authorization of the plaintiffs, the Bank made the following debits to Structures' deposit accounts to satisfy that company's remaining indebtedness under the loans:

Account No. 010–716–6

| | | |
|---|---|---|
| 6/1/78 | $10,000.00 | |
| 6/5/78 | 5,000.00 | |
| 6/6/78 | 5,000.00 | |
| 6/7/78 | 22,829.94 | |
| 6/16/78 | 6,151.67 | |
| 6/19/78 | 5,505.53 | |
| | $54,487.14 | $54,487.14 |

Account No. 010–722–0

| | | |
|---|---|---|
| 6/12/78 | $ 6,000.00 | |
| 6/19/78 | 18,840.62 | |
| | $24,840.62 | $24,840.62 |
| Total | | $79,327.76 |

There is no dispute that the entire balance of these accounts at the time of these set–offs was attributable to funds derived from cash sales of inventory, collections of accounts receivable, or funds wired by NAC to Structures pursuant to their loan agreements.

Actuated in part by this drain of its operating funds, Structures filed a petition for an arrangement under Chapter XI of the Bankruptcy Act on or about June 29, 1978.

The Bank received notice of these proceedings and was listed as a general creditor of Structures. In connection with these bankruptcy proceedings, the plaintiffs entered into an Inter–Creditor Agreement, approved by the Bankruptcy Court, in which the plaintiffs agreed upon a plan for sharing any proceeds of certain of Structures' pre–bankruptcy accounts which might be collected in this litigation.

On July 19, 1979, NAC brought the present action, contending that the funds in the accounts setoff by the Bank represented identifiable proceeds of collateral secured by its loan and security agreement with Structures, that its security interest expressly extended to these proceeds and was superior to any interest of the Bank, and that it was entitled to these funds by reason of Structures' default on its obligations to NAC evidenced by its petition in bankruptcy. Mitsubishi later intervened also alleging that it had a prior security interest in the proceeds deposited in the accounts set–off by the Bank, and that it was entitled to these funds by reason of Structures' default. The Complaints demanded return of the sums and that judgment be entered against the Bank for the amount of the funds appropriated from these accounts by the Bank, plus interest from the dates of the set–offs. The Complaints also seek punitive damages and an award of attorney's fees.

■ The first point we must consider is whether the plaintiffs had a security interest in the funds set–off by the Bank. There is not much question that the funds in the accounts did not fall within the first generation of collateral listed in the various security agreements. Therefore, these funds could be covered by these agreements only if found to be proceeds of the enumerated collateral. "Proceeds," as defined by section 9–306(1) of the Uniform Commercial Code, as adopted in Virginia, *Va.Code* § 8.9–306(1), includes "whatever is received

---

**2.** While the plaintiffs urge that this loan was made not to Concrete Structures, but to a sister corporation, Concrete Erectors, we need not decide this question in light of our holding which is dispositive of the issues presented even if it is assumed that this loan was attributable to Concrete Structures.

upon the sale, exchange, collection or other disposition of collateral or proceeds." This definition is to be given a flexible and broad content. *See In re Munger*, 495 F.2d 511, 513 (9th Cir. 1974) (construing the same section as adopted in California). *Section 9–306(2)* of the Code, *Va.Code* § 8.9–306(2) provides that a security interest continues in "any identifiable proceeds" of collateral. This security interest is continuously perfected for ten days if the interest in the original collateral was perfected, and thereafter remains perfected if a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds. *Va.Code* § 8.9–306(3).

As previously noted, the parties have stipulated that the funds set–off by the Bank were derived from three sources: sales of inventory, collections of accounts receivable, and funds wired to Structures' deposit accounts by NAC pursuant to their loan agreements. The parties have also stipulated the amount of such funds attributable to each of these sources. Thus, no problem of identification or attribution of these funds exists. With regard to the funds attributable to sales of inventory and collections of accounts receivable, there is no question that these constituted proceeds within the meaning of section 9–306(1), or that the collateral giving rise to these funds was covered by the perfected security agreements of both Mitsubishi and NAC. Mitsubishi expressly retained a security interest in Structures' "inventory . . . now owned or hereafter acquired and proceeds thereof," and its outstanding and future "accounts receivable . . . and proceeds thereof." Similarly, NAC's perfected security interest extended to "existing and future accounts. . . ., presently owned and hereafter acquired inventory. . . ., and all proceeds . . . of the foregoing described properties. . . ." It follows that the plaintiffs possessed perfected security interests in the funds attributable to sales of inventory and collections of accounts receivable.

The Bank, however, contends that the funds wired to the accounts by NAC, which constituted the majority of funds on deposit, were not covered by the plaintiffs' security interests. We disagree. In their briefs, the parties hotly debate whether the funds wired by NAC to the deposit accounts represented proceeds of two categories of collateral enumerated, respectively, in the security agreements of NAC and Mitsubishi: "general intangibles" or "contract rights." In our view, we need not determine whether they are proceeds of either category. Rather, these funds constituted proceeds of Structures' accounts receivable, a category of collateral covered by both NAC's security interest in "accounts receivable" and Mitsubishi's interest in "accounts."

Under the accounts receivable financing arrangement between NAC and Structures, NAC agreed to loan Structures a fixed percentage[3] of whatever accounts receivable Structures tendered for financing, subject to NAC's right reasonably to refuse "unacceptable" accounts. In return, Structures was obligated to send all payments made on financial accounts directly to NAC. Any balance collected from these accounts exceeding the amount advanced to Structures and the agreed finance charge became the property of Structures, although NAC reserved the right to retain such amounts as additional collateral. This financing arrangement, closely resembling an assignment of Structures' accounts to NAC in return for their face value less an agreed finance charge, constituted an "other disposition of" the secured accounts receivable within the meaning of section 9–306(1). The cash proceeds of this disposition, wired by NAC to Structures' deposit accounts, was subject to the plaintiffs' perfected security interest.[4]

**3.** The percentages which NAC agreed to advance were 50% of the face amount of accounts arising from the sale of precast and prestressed concrete products, and 80% of the face amount of accounts arising from the sale of concrete masonry products.

**4.** Our conclusion that the proceeds in the deposit accounts were identifiable is not affected by the fact that funds attributable to the various sources were commingled. *See, e. g., Brown & Williamson Tobacco Corp. v. First Nat. Bank*, 504 F.2d 998 (7th Cir. 1974).

We come now to the key issue in this action: whether the Bank's right of set–off was subordinate to the plaintiffs' security interest in the proceeds deposited in Structures' deposit accounts. In this diversity action, the answer to this issue is, of course, governed by the law of Virginia. Virginia law long ago recognized the common–law right of a bank, as a debtor of its depositors, to set–off a matured debt owed to the bank by a depositor against funds on deposit. *See, e. g., Federal Reserve Bank v. State & City Bank & Trust Co.*, 150 Va. 423, 143 S.E. 697 (1928); *Nolting v. National Bank of Va.*, 99 Va. 54, 37 S.E. 804 (1901); *Ford's Adm'r v. Thornton*, 3 Leigh 695 (1832). Although often referred to as a "banker's lien," this right of set–off is not properly a lien upon a depositor's account. Rather, it is "a mere right of the bank to retain in its own possession property the title of which (absolute or special) is, or, in the case of negotiable paper, purports to be, in one against whom the bank has some demand until that demand is satisfied." *Nolting v. National Bank of Va.*, 99 Va. 54, 60–61, 37 S.E. 804, 806 (1901), *quoting*, 1 Morse, *Banks*, § 323. This right, however, is not absolute. Virginia adheres to the majority rule that if the bank can be charged with knowledge of the interest of a third party in a deposit account, or notice of facts sufficient to put it on inquiry that such an interest exists, it may not apply the account to satisfy a debt owed by the depositor. *See Peoples Nat. Bank v. Coleman*, 175 Va. 483, 9 S.E.2d 333 (1940); *Federal Reserve Bank v. State & City Bank & Trust Co., supra. See also Skilton, The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code*, 1977 *So.Ill.U.L.J.* 120, 190–96 (distinguishing this "legal" rule from the "equitable" rule giving precedence to the third–party over the bank even if the bank lacked knowledge or notice). If called upon to evaluate this case under the common–law doctrine of set–off in Virginia, therefore, we would be put to the task of determining whether the Bank had either actual knowledge of the plaintiffs' interests in Structures' deposit accounts, or notice of facts

sufficient to put the Bank to a further inquiry as to the existence of such interests.

It is not clear, however, whether this common–law approach to the present priority issue has been altered by Virginia's adoption of Article 9 of the Uniform Commercial Code, which establishes a comprehensive scheme of rules governing secured transactions and the relative dignity of conflicting interests in collateral. Section 9–104(i) of the Code, *Va.Code* § 8.9–104(i), states:

> This title does not apply ... to any right of set–off. . . .

Two views of this language have been espoused. Several jurisdictions have held that this exclusion was intended to indicate only that a right of set–off arises under state law as a result of the parties' status, without regard to compliance with the Code, and not that an otherwise extant right of set–off is exempt from Article 9's rules concerning priority of interests in collateral. *See Citizens Nat. Bank v. Mid–States Development Co.*, Ind.App., 380 N.E.2d 1243, 1247 (1978); *Morrison Steel Co. v. Gurtman*, 113 N.J.Super. 474, 274 A.2d 306, 310 (1971); *Associates Discount Corp. v. Fidelity Union Trust Co.*, 111 N.J. Super. 353, 268 A.2d 330, 332 (1970). These courts find support for this conclusion in the remarks of a principal reporter of Article 9, Professor G. Gilmore, who has stated the following view of this exclusion:

> This exclusion is an apt example of the absurdities which result when draftsmen attempt to appease critics by putting into a statute something that is not in any sense wicked but is hopelessly irrelevant. Of course a right of set–off is not a security interest and has never been confused with one: the statute might as appropriately exclude fan dancing. A bank's right of set–off against a depositor's account is often loosely referred to as a "banker's lien," but the "lien" usage has never led anyone to think that the bank held a security interest in the bank account. Banking groups were, however, concerned lest someone, someday, might think that a bank's right of set–off, be-

cause it was called a lien, was a security interest. Hence the exclusion, which does no harm except to the dignity and self–respect of the draftsmen.

This position could also be supported by reference to section 9–306(4) of the Code, *Va.Code* § 8.9–306(4), which provides in pertinent part:

> (4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
>
> .    .    .    .    .
>
> (d) in all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is
>
> (i) subject, to any right of setoff . . . .

Arguably, this provision would be unnecessary if the relative priority of any right of set–off was unaffected by Article 9 because all perfected security interests, and not merely those recognized under section 9–306(4)(d), would be equally "subject to any right of setoff." [5]

Further support could be found in another exclusion under section 9–104(h), *Va. Code* § 8.9–104(h), which provides:

> This title does not apply . . . to a right represented by a judgment (other than a judgment taken on a right to payment which was collateral. . . .

The priority of a judgment lien creditor's interest in secured property clearly is governed by the various priority rules of Article 9, notwithstanding this exclusion. *See, e. g.,* U.S.C. § 9–301(1)(b), *Va.Code* § 8.9–301(1)(b) (stating that an unperfected security interest is subordinate to the rights of a lien creditor without knowledge of the security interest and before it is perfected).

Other jurisdictions and commentators have disagreed with this interpretation of section 9–104(i), declaring instead that this provision renders inapplicable not only those portions of Article 9 governing the creation of security interests, but also the various priority provisions of that Article. *See, e. g., First National Bank v. Lone Star Life Ins. Co.,* 529 S.W.2d 67, 68 (Tex.1975) (disapproving a lower court's holding that § 9–104(i) did not preclude application of the Article 9 priority provisions). *See also* Skilton, *The Secured Party's Right in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code,* 1977 So.Ill. U.L.J. 120, 203–04; Note, *Conflicts Between a Bank's Common Law Right of Setoff and a Secured Party's Interest in Identifiable Proceeds,* 9 *Loyola U. of Ch.L.J.* 454, 462–65 (1978).

The last cited commentator makes several persuasive arguments regarding the construction of section 9–104(i) together with various other provisions of Article 9, indicating that the Code's drafters intended the exclusion of set–off rights to be absolute.[6]

---

**5.** Section 9–306(4)(d)(i) does not create a right of set–off. Rather, it continues any right of set–off which might otherwise exist under prior state law. *See, e. g., Middle Atlantic Credit Corp. v. First Pa. Banking & Trust Co.,* 199 Pa.Super. 456, 185 A.2d 818 (1962). This section, however, is not applicable in this case. That exception applies only "in the event of insolvency proceedings." The present proceedings, while occasioned by Structures' insolvency, are not insolvency proceedings, defined at section 1–201(22) of the Code, *Va.Code* § 8.1–201(22), as "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved." *See Citizens Nat. Bank v. Mid–States Develop. Co.,* Ind.App., 380 N.E.2d 1243, 1246 (1978).

**6.** Controversy over whether the exclusions enumerated in section 9–104 of the Code should be given a broad or narrow construction has not been limited to the exclusion of set–offs under subsection (8). For example, some courts have narrowly construed exclusion of "a landlord's lien" under section 9–104(b) to mean only that such liens may be asserted without complying with Article 9, though they remain subject to the priority rules of that Article. *See Peterson v. Ziegler,* 39 Ill.App.3d 379, 350 N.E.2d 356 (1976). Other courts have broadly construed this provision to exclude any application of Article 9 to disputes involving the formation or priority of a landlord's lien. *See Bates & Springer, Inc. v. Friermood,* 109 Ariz. 203, 507 P.2d 668 (1973); *Jenkins v. Archer–Daniels–Midland Co.,* 570 S.W.2d 823 (Mo.App. 1978).

Other indications as to the scope of the exclusion of rights of set–off, may be gleaned from several sources in the commentary accompanying Article 9. The first such indication is found in the Official Comment to section 9–101, *Va.Code* § 8.9–101, the first sentence of which states:

This Article sets out a comprehensive scheme for the regulation of *security interests* in personal property and fixtures.

As noted above, a bank's right of set–off is not a "security interest" within the meaning of Article 9, leaving one to speculate that interests in property other than security interests are beyond the scope of all portions of Article 9. *See also* U.C.C. § 1–201(37), *Va.Code* § 8.1–201(37) (defining "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation"). That this distinction between security interests and the interest such as that represented by rights of set–off underlies the exclusion of set–off rights from Article 9 under section 9–104(i) is confirmed by paragraph 8 of the Official Comment to section 9–104, which states:

The remaining exclusions go to other types of claims which do not customarily serve as commercial collateral: judgments under paragraph (h), *set–offs under paragraph (i)* and tort claims under paragraph (k).

No Virginia case has been uncovered aligning that jurisdiction with either of these two schools of thought concerning the scope of section 9–104(i). Nor is any decisive interpretive guidance provided by the Virginia Comments to that provision or other portions of Article 9. It is fortunate, therefore, that this Federal Court is not called upon to resolve this ambiguity of state law in this action, for the result we would reach under either interpretation is the same: The set–off accomplished by the Bank was improper and constituted a conversion of the property of at least one of the plaintiffs, NAC. We need not go further and decide whether it also constituted a conversion of property in which Mitsubishi had a superior interest. The security

interest of each of the plaintiffs in the deposit accounts exceeded the amount set–off by the Bank. In view of their October 1978, Inter–Creditor Agreement as to the distribution of certain proceeds collected by NAC in this action, and the subordination agreement previously entered into by the plaintiffs, it is sufficient to determine that NAC's interest prevails, leaving it to the plaintiffs to distribute the proceeds in accordance 'with their agreement.

▮ As stated previously, NAC possessed a perfected security interest in all of the funds set–off by the Bank, while the Bank's position was that of an unsecured general creditor. If we were to follow the lead of those jurisdictions which have narrowly construed section 9–104(i) of the Code, our decision in this case would be governed by the cornerstone principle underlying the Code's complex priority scheme, stated in section 9–201, *Va.Code* § 8.9–201:

Except as otherwise provided by this act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors.

This section states the fundamental rule that "the secured creditor, even an unperfected secured creditor, has greater rights in his collateral than any other creditor unless Article Nine provides otherwise." White & Summers, *Handbook of the Law Under the Uniform Commercial Code* 901 (1972). There being nothing in Article 9 providing otherwise, the Bank's unsecured interest would be subordinate to the secured interest of NAC. *See Citizens Nat. Bank v. Mid–States Develop. Co.*, Ind.App., 380 N.E.2d 1243 (1978); *Associates Discount Corp. v. Fidelity Union Trust Co.*, 111 N.J. Super. 353, 268 A.2d 330 (1970). *Cf. Middle Atlantic Credit Corp. v. First Pennsylvania Banking & Trust Co.*, 199 Pa.Super. 456, 185 A.2d 818 (1962).

Alternatively, were we to conclude that section 9–104(i) precludes application of any portion of Article 9 to this controversy, we are persuaded that the Bank was sufficiently aware of NAC's interest in the deposit accounts to prohibit it from appropriating

the funds from those accounts to satisfy its own claims.

At the time the deposit accounts were opened at the Bank, principals of Structures disclosed to the Bank's President, Harry Grymes, that various amounts of money would be wired into these accounts by NAC, pursuant to an accounts receivable financing arrangement. At least some aspects of this financing arrangement were conveyed to Mr. Grymes at a later meeting between he, Jack Lacy, Chief Administrative Officer of Structures, and Hyman Kanes, a former executive officer of NAC. While NAC's security interests may not have been specifically mentioned at these meetings, Mr. Grymes clearly was acquainted with the relations between NAC and Structures and the source of at least some of the funds deposited in the accounts, wired by NAC. Mr. Grymes conceded that he knew of these arrangements in his testimony.

The Bank's Cashier, Richard Wyatt, who worked closely with Mr. Grymes on the Structures' accounts and loans, testified that he knew in the early part of 1978, prior to the dates of the set–offs, that funds were being wired to Structures' accounts, and that there was a strong likelihood that these funds arose from an accounts receivable financing arrangement. Mr. Wyatt explained that he understood the mechanics of accounts receivable financing, and that he suspected that there were security agreements supporting the financing arrangement between Structures and NAC.

Notwithstanding this knowledge, Bank officials made the various loans later satisfied by set–offs without any effort to search the appropriate records to determine whether any security agreements or financing statements had been filed covering Structures' assets by NAC or any other entity. Such a search would have uncovered the interests held by both plaintiffs. Nor did it take the logical step of inquiring of Structures' officers whether any such security agreement existed and whether any interest in funds in the accounts had been conveyed to Structures' other creditors. The Bank failed even to ascertain whether its own purported security interests taken to secure payment of these loans had been properly perfected.

In short, the Bank chose to ignore evidence which would have led a reasonable man to conclude that the funds deposited in the deposit accounts were encumbered by the liens of third parties, or at least to inquire whether such interests existed. This knowledge or notice was sufficient to preclude any right of set–off it might otherwise have had and rendered its actions unlawful under Virginia commonlaw. *See Peoples Nat. Bank v. Coleman, supra; Federal Reserve Bank v. State & City Bank, supra.*

For these reasons, we conclude that the Bank converted property belonging to NAC when it set–off $79,327.76 from Structures' deposit accounts numbered 010–716–6 and 010–722–0 in June 1978, and that these funds must be returned to NAC. For the reasons stated previously, we need not decide whether the Bank had knowledge or notice of Mitsubishi's interest in these accounts.

■ In addition to the return of the funds set–off by the Bank, the plaintiffs seek punitive or exemplary damages. Under the law of Virginia, exemplary damages are "not given as plaintiff's due, but for the protection of the public, as a punishment to the defendant, and as a warning and example to deter him and others from committing like offenses." *Zedd v. Jenkins*, 194 Va. 704, 74 S.E.2d 791, 793 (1953). An award of punitive damages in Virginia can be supported only by proof of actual malice. *F.B.C. Stores, Inc. v. Duncan*, 214 Va. 246, 198 S.E.2d 595, 600 (1973). The evidence in this case does not support an award of punitive damages. While the Bank's negligence in turning a blind eye to obvious evidence of NAC's interest in the funds deposited in the accounts renders it liable for conversion, this conduct simply does not constitute actual malice. Nor does there appear to be any special danger that the Bank, or others in its position, will make a practice of this misconduct. Accordingly, the plaintiffs' request for punitive damages is DENIED.

Similarly, we DENY the plaintiffs' request for attorneys' fees. The general American rule is that the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). We can find no reason in Virginia law or in the circumstances of this case to justify a departure from this rule in this litigation.

The Clerk is DIRECTED to enter judgment in accordance with this Opinion.

### ORDER

#### On Motion To Amend Judgment

This matter is before the Court on the plaintiffs' motion to alter or amend this Court's Order entered August 18, 1980, awarding judgment in favor of National Acceptance Company of America (NAC) against Virginia Capital Bank but denying NAC's request for interest as compensatory damages from the date of conversion until the date of judgment.

The parties have agreed that *Straley v. Fisher*, 176 Va. 163, 10 S.E.2d 551 (Va.Sup. Ct.1940), states the general rule of damages in a conversion action in Virginia. In *Straley*, the Virginia Supreme Court stated that, in conversion, "the measure of damages, as a *general* rule, is the value of the property converted at the time and place of conversion." 176 Va. 163, 167, 10 S.E.2d 551, 553 (1940). The Court stated further that, "[w]hile there are exceptions to this general rule, the exceptions usually apply where such measure does not accord with the principle of just compensation for the loss sustained." *Id.*

The plaintiffs have endeavored to fit their case within the exception to this general rule. The plaintiffs contend that returning only the money converted by the defendant fails to compensate them justly for the loss sustained by the set–off. It is the plaintiffs' position that, but for the set–off, the plaintiffs would have received the prevailing rate of interest in effect between NAC and Concrete Structures (Structures) on the funds converted from the date of conversion to the date of judgment. The evidence is to the contrary.

Structures was in deep financial trouble at the time the Bank set–off the funds. Given the impending insolvency of Structures, it is highly speculative to propose that Structures would have rendered regular interest payments on the money at the prevailing rate even if the Bank had not set–off the funds.

In addition, it is equally speculative to propose that, if the Bank had not set–off the funds, NAC would have had the immediate use of those funds to lend to other entities. It is more likely that Structures' assets would have been tied up in bankruptcy adjudications and it is impossible to determine whether or when NAC would have actually received the funds. Additionally, even if NAC would have received all of the funds on the date of conversion if the Bank had not set–off the funds, the plaintiffs have not established that they had a borrower ready and willing on that date to receive those funds at the prevailing rate in effect between NAC and Structures.

The Court finds that a return of the funds converted is in accord with the principle of just compensation for the loss sustained by NAC. *See* 176 Va. 163, 10 S.E.2d 551 (1940). The plaintiffs have not established that any additional damage resulted from the conversion of the funds. Any award of interest from the date of conversion until the date of judgment would require the Court to engage in speculation and conjecture and the law does not favor such recoveries. *See Heinzman v. Fine, Fine, Legum and Fine*, 217 Va. 958, 234 S.E.2d 282 (Va.Sup.Ct.1977).

The Court DENIES the plaintiffs' motion seeking an award of interest as compensatory damages from the date of conversion until the date of judgment.