INSLEY MANUFACTURING
CORPORATION, Plaintiff
and Respondent,

v.

DRAPER BANK & TRUST,
Defendant and Appellant.

No. 19317.

Supreme Court of Utah.

April 24, 1986.

4. U.C.A., 1953, § 58–37–13(9)(j)(i).

5. *State v. One Porsche, supra* (Crockett J., dissenting).

Dwight L. King, Salt Lake City, for defendant and appellant.

Kim R. Wilson, Henry C. Chai, Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

Insley Manufacturing Corp. ("Insley") sued Draper Bank & Trust ("Draper") for conversion of secured collateral. About a year later, both parties moved for summary judgment. The trial court ruled in favor of Insley. On appeal, Draper seeks reversal of the lower court order and judgment entered in favor of its summary judgment motion or, alternatively, that the case be remanded for trial. We affirm.

## I.

Insley sold to Schneider Machinery Sales ("Schneider") an H 1500–C backhoe. Insley financed the transaction and received a security interest in the equipment and its proceeds on October 16, 1978. Insley then filed a financing statement with the Secretary of State's office on November 20, 1978. The statement covered: "All Insley Backhoes, Attachments, Accessories, and Parts sold to Debtor by Secured Party for resale or rental by the debtor, in which secured party has a security interest whether now owned or hereinafter ac-

quired, including proceeds from such sale or rental payments received under the rental of such equipment." The H 1500–C was shipped by Insley on March 1, 1979.

In March of 1979, Draper established business checking account No. 81–02047–1 for Schneider. Sometime *prior* to October 5, 1979, five checks totalling $91,621.25 and drawn against the account were presented to Draper for payment. On October 5, Draper determined that the account contained insufficient funds to cover the checks and decided to pay them in overdraft. Accordingly, on that date, Draper notified Schneider in a debit memo that the bank intended to cover the checks and charge the account a $15 service charge and 18% interest for use of the funds. According to Schneider's bank statement, however, this transaction was posted on October 9, 1979.[1]

On October 9, 1979, Schneider completed the sale of the H 1500–C backhoe and an H 1000 backhoe to L.J. O'Brien for $237,918.30. The proceeds from the sale were given to Schneider in the form of a check from O'Brien's financing company, ITT Industrial Credit Company ("ITT"). The same day, Schneider deposited the check along with others into the Draper account. The total deposit was $238,491.53. Draper, in turn, credited Schneider's account for the deposit and then paid itself from the account for the money loaned to pay the checks. Schneider then paid Insley $79,212.80 for the H 1000 backhoe, but could not pay for the H 1500–C because of Draper's debit of the account. A deposition relied on by plaintiff in its summary judgment motion indicates that Schneider owed approximately $130,000 to Insley for the H 1500–C.

---

1. At argument, counsel for Draper argued that a computer printout constituting Schneider's October 1979 bank statement failed to reflect an overdraft. However, the deposition of Draper's president and director, Dewey Bluth, explains that the transaction is not reflected because of Draper's procedure in handling returnable items and in posting transactions on its computer; in short, the printout fails to reflect the actual timing of events at the bank. Bluth, who approved all of Draper's items paid in overdraft, admitted the overdraft existed. Also, the charges listed in the overdraft debit memo correspond to those on Schneider's bank statement. In view of the facts submitted below taken in light of the midnight deadline imposed by U.C.A., 1953, § 70A–4–301(1), the claim of no overdraft is spurious.

Schneider filed for voluntary bankruptcy on August 6, 1980. Insley filed this action on March 25, 1982. On April 7, 1983, Insley moved for summary judgment. On April 21, 1983, Draper also moved for summary judgment based on "undisputed facts that are presented by the Motion, Affidavits, deposition of President Dewey C. Bluth, Draper Bank & Trust Company, and the Memorandum submitted by plaintiff and defendant." Insley's motion was granted on April 26, 1983. The following day, defendant filed its objections, claiming material issues of fact remained. Specifically, Draper contended that there was no evidence presented that the debtor (Schneider) had not paid the balance owing on the H 1500–C. Draper also moved the court for permission to file the voluntary bankruptcy petition and schedules attached thereto as exhibits. Draper's motion to file the exhibits was denied on May 18, 1983. Further, on May 31, 1983, Insley filed a supplemental affidavit which stated that the indebtedness secured by the H 1500–C backhoe had exceeded $91,621.25 since October 9, 1979, and remained unpaid on the 17th of May, 1983. Accordingly, on June 6,

1983, the trial judge entered judgment in Insley's favor.

## II.

■ Insley entered into the H 1500–C security agreement with Schneider to secure the purchase price of the backhoe. Insley then filed a UCC–1 with the proper filing officer. Thus, after Insley delivered the H 1500–C to Schneider, Insley had a perfected purchase money security interest in the inventory.[2] When Schneider sold the H 1500–C backhoe, Insley lost its security interest in that inventory,[3] but its interest remained in the identifiable cash proceeds (the portion of the ITT check attributable to the H 1500–C sale price).[4] When Schneider deposited the ITT check on October 9, its account was credited with the entire amount. The account, a "deposit account," then contained, in part, identifiable cash proceeds from the H 1500–C sale.[5] Draper contends that Insley's security interest became unperfected because Draper is not constrained by section 9–306(3).[6] Such a broad assertion is untenable, however, particularly in light of the 1977 amendment to the Utah Code excepting proceeds from its exclusion provisions.[7]

**2.** *See* U.C.A., 1953, §§ 70A–9–203(1)–(2), –107(a), –302(1), –303(1), –401(1), –402(1), (3), (10). The Insley/Schneider transaction was a multistate transaction. For purposes of this opinion, we presume sections 70A–9–103(1)(a) and (b) are controlling. U.C.A., 1953, § 70A–9–109(4) provides that goods held by a person for sale or lease are classified as inventory. *See also* U.C.A., 1953, § 70A–9–105(1)(h).

**3.** *See* U.C.A., 1953, §§ 70A–9–205, –307(1). Insley's security agreement expressly provided that Schneider could sell the inventory in the ordinary course of business.

**4.** *See* U.C.A., 1953, §§ 70A–9–306(1)–(2), –203(3). The bank was not a buyer in the ordinary course of business. *See* U.C.A., 1953, § 70A–1–201(9).

**5.** *See* U.C.A., 1953, §§ 70A–9–105(e), –306(1)–(2). The case law authority is almost unanimous that commingling of cash proceeds with other funds does not necessarily make the proceeds unidentifiable. *E.G., C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.,* 89 Ill. 2d 27, 31, 59 Ill. Sec. 85, 87, 431 N.E.2d 370, 372 (1982) (argument that security interest in proceeds terminates when deposited in bank account because

identification is impossible has found little favor in the courts); *Michigan Nat'l Bank v. Flowers Mobile Homes Sales, Inc.,* 26 N.C.App. 690, 695, 217 S.E.2d 108, 111–12 (1975) (rule requiring separate account for earmarked proceeds incompatible with underlying purpose of code); *Anderson, Clayton & Co. v. First Am. Bank,* Okla., 614 P.2d 1091, 1093–94 (1980). *See also* U.C.A., 1953, § 70A–1–102(2) (purpose of the UCC), § 70A–9–205 (concerning in part the freedom of a debtor to commingle proceeds), § 70A–1–103 (code is to be supplemented by "principles of law and equity").

**6.** Unless otherwise indicated, all references are to the Uniform Commercial Code contained in U.C.A. tit. 70A.

**7.** The Code now provides that article nine does not apply "to a transfer of interest in any deposit account, . . . except as provided with respect to proceeds (section 70A–9–306) and priorities in proceeds (section 70A–9–312)." U.C.A., 1953, § 70A–9–104(*l*). Prior to the 1977 amendment the substance of § 70A–9–104(*l*) was contained at U.C.A., 1953, § 70A–9–104(k). That provision provided that article 9 did not apply "to a transfer in whole or in part of any of the following:

Although Draper claimed at argument that Insley's cited authority was inapposite, we find that Insley's authority squarely addresses the dispositive issue in this case: [8] whether section 9–104(i), stating that article nine does not apply "to any right of setoff," has any applicability to the priority provisions of article nine.

A small minority of jurisdictions and some commentators have construed 9–104(i) broadly, taking the position that the provision excludes all situations concerning setoffs, not only from the Code's security and filing provisions, but also from the Code's *priority provisions.*[9] The principal reasoning underlying these decisions is as follows: First, the official comment to the Uniform Commercial Code can be read as favoring this view. For example, the official comment to 9–101 provides "[t]his Article sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures." Since setoffs are excluded from the Code's definition of security interests, it is possible to conclude "interests in property other than security

interests are beyond the scope of all portions of Article 9."[10] Second, other 9–104 exclusions, such as the "landlord's lien," have been construed as controlling over the Code's priority provisions.[11] Third, commentators claim the Code can be read as indicating its drafters intended 9–104(i) to be absolute.[12] Fourth, the language in Professor Gilmore's commentary (quoted *infra* ) has been extended beyond its meaning.[13]

A majority of jurisdictions have construed section 9–104(i) narrowly to mean that a right of setoff may exist in a creditor who fails to comply with the security agreement and filing provisions of article nine, but that the section 9–104(i) exclusion does not extend to the Code's priority provisions.[14] The reasoning underlying the majority view is significantly more persuasive than that underlying the broad interpretation followed by the minority of courts.

In regard to section 9–104(i), Professor Gilmore, a principal reporter for article nine, explained:

any claim arising out of tort; any deposit, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization." *See also* Coogan, Kripke & Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses, and Participation Agreements,* 79 Harv. L. Rev. 229, 263 (1965), *cited with approval in Commercial Discount Corp. v. Milwaukee W. Bank,* 61 Wis. 2d 671, 684 n. 18, 214 N.W.2d 33, 39 n. 18 (1974).

**8.** Specifically, Insley cites *Citizens Nat'l Bank v. Mid-States Dev. Co.,* 177 Ind.App. 548, 380 N.E.2d 1243 (1978). *Citizens National* squarely deals with offsets against cash proceeds held by banks in deposit accounts, *United States v. Handy & Harman,* 750 F.2d 777, 787 (9th Cir. 1984).

**9.** E.g., *State Bank v. First Bank,* Minn., 320 N.W.2d 723, 725 (1982); *First Nat'l Bank v. Lone Star Life Ins. Co.,* Tex., 529 S.W.2d 67, 68 (1975) (per curiam); Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code,* 1977 S.Ill. U.L.J. 120, 201–05.

**10.** *See National Acceptance Co. of Am. v. Virginia Capital Bank,* 498 F.Supp. 1078, 1085 (E.D.Va. 1980), *aff'd in part, reversed in part,* 673 F.2d

1314 (4th Cir.1981). *See also National Acceptance Co. of Am. v. Virginia Capital Bank,* 491 F.Supp. 1269, 1273 (E.D.Va.1980).

**11.** 1 P.Coogan, W. Hogan, D. Vagts & J. McDonnell, Secured Transactions Under the Uniform Commercial Code § 5A.15[2] (1985).

**12.** *See generally* Note, *Conflicts Between a Bank's Common Law Right of Setoff and a Secured Party's Interest in Identifiable Proceeds,* 9 Loy.U.Chi.L.J. 454, 462–65 (1978).

**13.** 1 P. Coogan, W. Hogan, D. Vagts & J. McDonnell, Secured Transactions Under the Uniform Commercial Code § 5A.15[2] (1985).

**14.** *E.g., Continental Am. Life Ins. Co. v. Griffin,* 251 Ga. 412, 414, 306 S.E.2d 285, 287 (1983); *Farns Assocs. v. South Side Bank,* 93 Ill.App.3d 766, 771–72, 49 Ill.Dec. 128, 132–34, 417 N.E.2d 818, 822–24 (1981); *Citizens Nat'l Bank v. Mid-States Dev. Co.,* 177 Ind.App. 548, 556, 380 N.E.2d 1243, 1248 (1978); *Coachmen Indus., Inc. v. Security Trust & Sav. Bank,* Iowa, 329 N.W.2d 648, 650 (1983); *Morris Plan Co. v. Broadway Nat'l Bank,* Mo.App., 598 S.W.2d 557, 560 (1980); *Associates Discount Corp. v. Fidelity Union Trust Co.,* 111 N.J.Super. 353, 357–58, 268 A.2d 330, 332 (1970); *First Wisconsin Nat'l Bank v. Midland Nat'l Bank,* 76 Wis.2d 662, 670, 251 N.W.2d 829, 833 (1977).

This exclusion is an apt example of the absurdities which result when draftsmen attempt to appease critics by putting into a statute something that is not in any sense wicked but is hopelessly irrelevant. Of course a right of set-off is not a security interest and has never been confused with one: the statute might as appropriately exclude fan dancing. A bank's right of set-off against a depositor's account is often loosely referred to as a "banker's lien," but the "lien" usage has never led anyone to think that the bank held a security interest in the bank account. Banking groups were, however, concerned lest someone, someday, might think that a bank's right of set-off, because it was called a lien, was a security interest. Hence the exclusion, which does no harm except to the dignity and self-respect of the draftsmen.[15]

This language indicates that banks need not comply with article nine to create a right of setoff, but given the narrow purpose of the exclusion it is unsound to read it as removing transactions in the commercial arena from the Code when the priority of a setoff is involved.[16] Additional support for the majority rule can be found by examining other exclusion sections in 9–104. For example, 9–104(c), the exclusion for mechanic's liens and liens for services, and 9–104(h), the exclusion for the judgment lienor, have their priority in terms of secured property clearly spelled out in the Code's various priority provisions.[17] Arguably, had drafters of the Code intended 9–104(i) to exclude setoffs from the priority provisions, they would have expressly so provided as they did with other exclusion sections. This rationale may be extended further by examination of 9–201, which provides that security agreements are effective according to their terms between the parties, and against *third-party creditors*, except as otherwise provided by the Code. There is no express provision in the Code suggesting a perfected security interest is subordinate to a right of setoff.

Further support for a narrow interpretation of 9–104(i) is gleaned from examination of 9–306(4)(d), which provides:

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
>
> . . . .
>
> (d) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is
>
> (i) subject to any right of setoff. . . .

The contention is that "this provision would be unnecessary if the relative priority of any right of set-off was unaffected by Article 9 because all perfected security interests, and not merely those recognized under section 9–306(4)(d), would be equally 'subject to any right of setoff.' "[18]

Moreover, section 1–102[19] mandates that the Code is to be liberally construed to promote its underlying purposes and policies, including the clarification of the law governing commercial transactions. The purpose and concept of notice filing would be significantly weakened if we held that Draper is not bound by that which it would have discovered through a proper inquiry.[20]

Finally, section 9–205 provides in part: "A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral . . . or to use, commingle or dispose of proceeds. . . ."

---

**15.** G. Gilmore, Security Interests in Personal Property 315–16 (1965).

**16.** *E.g., Citizens Nat'l Bank,* 177 Ind.App. at 555, 380 N.E.2d at 1248.

**17.** *See, e.g.,* U.C.A., 1953, §§ 70A–9–310, –301(1)(b).

**18.** *National Acceptance Co.,* 498 F.Supp. at 1084.

**19.** Principles of construction found in chapter one are integrated into article nine by section 70A–9–105(4).

**20.** *See Farns Assocs.,* 93 Ill.App.3d at 772, 49 Ill.Dec. at 133, 417 N.E.2d at 823.

The purpose of the provision is to relieve creditors from the age-old requirement of policing collateral in the hands of a debtor. Adoption of the minority approach places such a duty on creditors and "would severely undercut significant values of certainty, efficiency and reliance which are at the heart of the Codal emphasis on public filing."[21] A secured party should be able to rely on his compliance with the Code's requirements for perfection and his search of the record as against an unrecorded interest of a setting-off bank.[22]

In its brief, Draper contends that proceeds in the form of checks which are deposited in checking accounts should not be held in abeyance for ten days. Draper implies that such a result is necessary if this Court rules in favor of Insley. Drafters of the Code were also concerned with this problem. Section 4-208 provides that a *collecting* bank has a perfected security interest in a deposited item as a matter of law when it credits a customer's account in reliance on the deposited item. The section also gives the collecting bank priority in the security interest.[23] In this case, however, Draper, while standing in the shoes of a *payee* bank, determined on October 5, 1979, that Schneider's account contained insufficient funds to cover the presented items. Draper could have most easily and least expensively avoided this dispute; Draper could merely have returned the items it covered for Schneider in overdraft.[24] Instead, Draper advised Schneider on October 5 that it was extending nearly $100,000 to cover the checks. A debit memo in the record indicates that Draper notified Schneider that Draper was charging Schneider a $15 fee and 18% interest for this "service." This transaction was not secured since the bank was not lending against a deposited item.

Draper contends that section 9–306(4) governs the priority dispute in this case since Schneider was not able to cover the checks as they were presented to the bank. Draper relies on *Citizens & Southern National Bank v. Weyerhaeuser Co.*[25] However, that case is easily distinguished. In *Citizens & Southern,* the bank exercised its right of setoff only after the debtor acknowledged in writing that it was in default, authorized the bank to take possession of its assets, and ceased operations. Here, the fact that Draper agreed to lend Schneider the funds to pay the checks on October 5 establishes that Schneider was solvent; a company is not insolvent merely because it has to pay its bills with borrowed funds. The court in *Citizens National Bank*[26] was unpersuaded by a similar argument:

> This argument is without merit. It is premised on a misconstruction of the language and purpose of section 9–306(4)(d). The triggering phrase of that section is "In the event of insolvency proceedings instituted by or against a debtor...." It is plain that the limiting provisions of subsections (4)(d)(i) and (ii) are to serve as tracing rules for the secured party asserting an interest in proceeds *only* when they are brought within the debtor's estate in an insolvency proceeding. Here the funds in question were not made a part of Huntington's estate in bankruptcy. For purposes of determining the validity and extent of Soya's proceeds security interest, the subsequent institution of bankruptcy proceedings in the present case is irrelevant. Since the limitations contained in section 9–306(4)(d) have no operation outside the area of insolvency proceedings the trial court properly disregarded them.[27]

---

21. *Id.*

22. *Citizens Nat'l Bank,* 177 Ind.App. at 559, 380 N.E.2d at 1249.

23. *See also* U.C.A., 1953, §§ 70A-9-203(1), 9-302(1)(f), 9-312(1).

24. U.C.A., 1953, § 70A-4-301.

25. 152 Ga.App. 176, 262 S.E.2d 485 (1979).

26. 177 Ind.App. at 548, 380 N.E.2d at 1243.

27. *Id.* at 553, 380 N.E.2d at 1246 (citations omitted). *See also National Acceptance Co.,* 498 F.Supp. at 1084 n. 5 ("present proceedings, while occasioned by Structures' insolvency, are not insolvency proceedings, defined at section

This is not an insolvency proceeding instituted by or against Schneider. Further, Schneider's bankruptcy in 1980 has no bearing on this case since the conversion occurred on October 9, 1979.

Analysis of the facts of this case pursuant to section 9–306(3) shows that Insley's purchase money security interest in the proceeds was perfected on October 9.[28] As noted above, Draper was an unsecured creditor on October 9. Although no specific rule deals directly with the priority conflict between Insley's perfected security interest and Draper's setoff rights, we believe that the Code's priority rules require that Insley's interest must prevail over Draper's right of setoff. The cornerstone of the Code's complex priority provisions, section 9–201, provides in pertinent part: "Except as otherwise provided by this act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." As stated in *Continental American Life Insurance Co.*:[29] "The effect of this section is to give the Article Nine secured party, upon a debtor's default, priority over 'anyone, anywhere, anyhow' except as otherwise provided by the remaining Code priority rules." Since there are no other rules in the Code to resolve the conflict, section 9–201 is controlling.

Draper also contends that it was a holder in due course and thus took the instrument free of Insley's security interest. However, the record does not reflect that Draper argued the holder-in-due-course theory below. Its papers all reflect argument as to why it and not Insley was

entitled to the deposit account. Draper may not raise this issue for the first time on appeal.[30]

Draper's claim that disputed material facts should have prevented the granting of Insley's motion is not well taken. Specifically, Draper claims there is a question as to whether Schneider fully or partially paid the H 1500–C debt. Contrary to claims in Draper's brief, Insley filed an affidavit in support of its motion for summary judgment which states the debt exceeded $91,621.25 as of January 24, 1983.[31] Only after the denial of Draper's motion did counsel attempt to introduce Schneider's bankruptcy schedules, though the same were available prior to the lower court order. Even if the trial court had permitted the schedules into evidence, the fact they show Insley as having no security interest in an H 1500–C does not support Draper's claim of disputed material facts. The sale to O'Brien of the H 1500–C (the only H 1500–C Schneider ever received) cut off Insley's security interest in the H 1500–C. Moreover, the schedules *do* show Insley with a security interest in proceeds of sale of $142,000. Finally, when Draper raised the issue in its objections, Insley filed another affidavit stating the balance was still owing. There are no disputed facts.

The judgment is affirmed. Costs to Insley.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HOWE, J., concurs in the result.

---

1–201(22) of the Code"); *Michigan Nat'l Bank,* 26 N.C.App. at 695, 217 S.E.2d at 112.

**28.** *See* U.C.A., 1953, §§ 70A–9–306(3)(b), (c), –302(1)(b).

**29.** 251 Ga. at 414, 306 S.E.2d at 287 (citations omitted).

**30.** *E.g., Bundy v. Century Equip. Co.,* Utah, 692 P.2d 754, 758 (1984). Even if Draper was a holder in due course, it would only take the ITT check free of Insley's security interest. The credit to Schneider's deposit account given in exchange for the check was proceeds under the

Code, and Insley's security interest would have remained in the deposit account until depleted in the ordinary course of Schneider's business.

**31.** The affidavit provides in part: "5. In October 1979, Schneider Machinery Sales owed Insley Manufacturing in excess of $91,621.25 on the H 1500–C backhoe. 6. Demand has been made upon Schneider Machinery Sales for payment, but Schneider Machinery Sales *has* failed to pay the amount it owes to Insley." (Emphasis added.)