[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
The decision herein rendered is in accordance with Superior Court Rules of Civil Procedure Rule 52. This matter is before the Court following a non-jury trial on stipulated facts, submitted by the parties pursuant to a Consent Decree for a decision on the following limited issues:
(a) Whether Richmond Ready-Mix, Inc. (Plaintiff) owns Atlantic Ready-Mix's (ARM) account receivable in the amount of $113,237.67 free and clear of both the promissory note signed by Steven Manni (Manni), in his capacity as president of Atlantic Ready-Mix (ARM) in favor of the Atlantic Concrete Forms, Inc. (Defendant) in the amount of $79,590, and the promissory note signed by Manni, in his capacity as president of ARM in favor of himself in the amount of $20,000 (or whether these promissory notes may be used to set off the amount of the account receivable due and owing to the Plaintiff);
(b) Whether the promissory notes in question are valid and enforceable against the Plaintiff.[1]
 STIPULATED FACTS
The parties stipulated to the following pertinent facts. In July of 1987, Manni and John Aiello (Aiello) incorporated ARM, a Rhode Island corporation, and were the principal shareholders, officers, and directors of this company. Stipulated Facts 1 and 2. ARM was in the business of manufacturing and selling ready-mix concrete. Stipulated Facts 3. ARM began operating in the fall of 1987 and continued to operate through November 1991. Stipulated Facts 1 and 19.
At the time of ARM's incorporation until the present, Manni has been a shareholder and president of the Defendant, a business that constructs foundations for residential and commercial buildings. Stipulated Facts 11 and 12. At the time ARM was formed, Aiello was a shareholder and officer of Richmond Sand 
Gravel, Inc., a company which sold sand and gravel products used in the manufacture of concrete. Stipulated Facts 13 and 14. At that time, Aiello was also an officer and shareholder of Aiello Construction, Inc., a company engaged in general construction. Stipulated Facts 13 and 14.
After ARM was incorporated, Citizens Trust Company (Citizens) extended financing to ARM to set up its manufacturing plant and begin its operations. Stipulated Facts 4. As part of this financing, Aiello and Manni signed valid and enforceable promissory notes to repay the monies lent by Citizens upon certain terms and conditions. Stipulated Facts 5. These promissory notes were signed on August 27, 1987. Stipulated Facts 5. In addition, Manni and Aiello, as officers and directors of ARM, signed a valid and enforceable security agreement granting Citizens a security interest in the assets of ARM, including but not limited to, all accounts receivable that were presently due and owing or due and owing in the future to ARM. Stipulated Facts 6. The security agreement was also signed on August 27, 1987. Stipulated Facts 6. Citizens properly perfected this security interest pursuant to the Rhode Island Uniform Commercial Code (U.C.C.) in September of 1987. Stipulated Facts 7.
At the time ARM was formed, Manni contributed capital in the amount of $20,000. Stipulated Facts 8. On July 1, 1987, Manni, as president of ARM, signed a valid and enforceable promissory note in the amount of $20,000 in favor of himself, payable on his demand Stipulated Facts 9. No security interest was granted by ARM in any collateral to secure this obligation. Stipulated Facts 9. At the time the promissory note was signed, it was valid and enforceable. Stipulated Facts 9. However, it is the Plaintiff's position that this promissory note was never valid and enforceable against the assets of ARM that were pledged as collateral to Citizens to secure the obligations of ARM under the promissory notes in favor of Citizens, that this promissory note was never valid and enforceable as a set off of amounts due and owing to ARM, and that this promissory note was never valid and enforceable against the Plaintiff. Stipulated Facts 9.
On January 15, 1989, Manni, in his capacity as president of ARM, signed a valid and enforceable promissory note in favor of his company, the Defendant, in the amount of $79,590 payable by ARM to the Defendant on demand Stipulated Facts 16. This promissory note was payable on demand by the Defendant. Stipulated Facts 16. ARM granted a security interest in certain motor vehicles to the Defendant to secure ARM's obligations under this promissory note. Stipulated Facts 16. However, at no time did ARM grant a security interest to the Defendant in ARM's account receivable to secure the obligations under this promissory note. Stipulated Facts 16. At the time this note was signed, it was valid and enforceable. Stipulated Facts 16. However, it is the Plaintiff's position that this promissory note was never valid and enforceable against the assets of ARM that were pledged as collateral to Citizens to secure the obligations of ARM under the promissory notes in favor of Citizens, that this promissory note was never valid and enforceable as a set off of amounts due and owing to ARM, and that the promissory note was never valid and enforceable against the Plaintiff. Stipulated Facts 16.
In October of 1991, ARM defaulted on its obligations to Citizens under the promissory notes signed on August 27, 1987. Stipulated Facts 22. Following this default, Citizens exercised its rights under its security agreement and under the U.C.C., and took possession of the collateral, including all the accounts receivable due and owing to ARM on November 19, 1991. Stipulated Facts 23. At that time, the business of ARM closed. Stipulated Facts 23. When Citizens took valid and legal possession of this account receivable on November 19, 1991, an amount receivable in the amount of $113,237.67 was on the books of ARM as due and owing from the Defendant. Stipulated Facts 24. This amount reflected the total of the Defendant's purchases of concrete from ARM from May of 1991 through November of 1991. Stipulated Facts 20. The Defendant did not pay for these purchases. Stipulated Facts 21. The Defendant does not dispute that it purchased concrete from ARM in the amount of $113,237.67. Stipulated Facts 24. However, the Defendant takes the position that the account receivable should be set off by two promissory notes issued by ARM — one in favor of the Defendant in the amount of $79,590, and one in favor of Manni in the amount of $20,000 — or any judgment thereon. Stipulated Facts 9, 16, 24.
On December 3, 1991, the Defendant received notification that the assets of ARM had been repossessed by Citizens and that the account receivable in the amount of $113, 237.67 was due and owing. Stipulated Facts 20, 25. The Defendant did not make payment on this account receivable. Stipulated Facts 26. In addition, some time between December 4, 1991 and March 4, 1992, the Defendant demanded payment of the promissory note signed by ARM in the Defendant's favor on January 15, 1989 in the amount of $79,590. Stipulated Facts 16, 26.
Citizens began to sell the collateral of ARM. Stipulated Facts 27. On July 6, 1992, pursuant to the rules on third party sales under G.L. § 6A-9-504, Citizens sold the collateral of ARM to the Plaintiff, including, but not limited to, the account receivable due and owing from the Defendant in the amount of $113,237.67. Stipulated Facts 27. One of the assets sold by Citizens to the Plaintiff was the account receivable due and owing from the Defendant to ARM in the amount of $113,237.67. Stipulated Facts 27.
Citizens complied with all provisions of the U.C.C. Stipulated Facts 33. The Plaintiff purchased the collateral of ARM from Citizens for adequate consideration and "for value" as that phrase is defined by G.L. § 6A-9-504(4). Stipulated Facts 28. Citizens provided legal and valid notice of the sale of the collateral to the Defendant and ARM. Stipulated Facts 29. For purposes of G.L. § 6A-9-504, the Plaintiff acted in good faith with regard to its negotiations and purchase of the collateral of ARM from Citizens, and Citizens acted in good faith concerning the negotiations for, and sale of the collateral of ARM to the Plaintiff. Stipulated Facts 30, 31. For purposes of G.L. §6A-9-504, the sale of the collateral from Citizens to the Plaintiff was commercially reasonable. Stipulated Facts 32.
 TRAVEL
This matter began as two separate lawsuits. On February 13, 1992, Citizens filed suit against the Defendant seeking payment in the amount of $113,237.67 — the amount owing and due to ARM's account receivable — plus interest, costs, and attorneys' fees. On January 7, 2000 the Plaintiff filed a complaint for a partition and accounting against the Defendant. Subsequently, on July 6, 1992, the Plaintiff purchased the account receivable of ARM from Citizens. Consequently, these two matters were consolidated on July 30, 2002. This case reached for trial on September 4, 2003. At that time, the parties agreed to stipulated facts which would govern the disposition of this case. Thereafter, the parties entered a Consent Decree limiting the disposition of this case to several issues and confining this Court's review to the stipulated facts, undisputed facts, and legal memoranda. This Court considered the Plaintiff's Memorandum of Law with accompanying exhibits, the Defendant's Answer and a Counterclaim with accompanying exhibits, and both parties' Replies.
For the reasons set forth below, this Court issues judgment in favor of the Plaintiff.
 STANDARD OF REVIEW
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." R.I. Sup. Ct. R. Civ. P. Rule 52(a) (2003). In accordance with this authority in a non-jury trial, "the trial justice sits as trier of fact as well as law." Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). When rendering a decision in a non-jury trial, the Rhode Island Supreme Court has interpreted Rule 52(a) to mean that "the trial justice need not engage in extensive analysis to comply with this requirement." White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983). Therefore, "even brief findings will suffice as long as they address and resolve the controlling factual and legal issues." Id.
 STANDING ON MANNI'S $20,000 PROMISSORY NOTE
A preliminary issue concerning the Defendant's standing is whether this Court will allow the Defendant to present Manni's claim with regard to the $20,000 promissory note granted by ARM in favor of Manni. "Standing is a matter of determining `whether the person whose standing is challenged has alleged an injury in fact resulting from the challenged [act]. If he [or she] has, he [or she] satisfies the requirement of standing.'" Ahlburn v.Clark, 728 A.2d 449 (R.I. 1999) (citing Pontbriand v. Sundlun,699 A.2d 856, 862 (R.I. 1997) (quoting Rhode IslandOphthalmological Society v. Cannon, 113 R.I. 16, 26,317 A.2d 124, 129 (1974)). Standing "boil[s] down to an issue of `whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise.'" Id. (citingPontbriand, 699 A.2d at 862) (quoting Association of DataProcessing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152 (1970)).
The Plaintiff aptly points out that the Defendant does not have standing to enforce this note because the Defendant is not the creditor on this note. Acknowledging this and recognizing the impact of res judicata on this issue, the Defendant nonetheless requests this Court determine the Plaintiff's liability with respect to Manni's promissory note. If necessary, the Defendant offers that Manni will assign the note to the Defendant and/or seek a post judgment remedy.
This Court finds it cannot consider Manni's promissory note in the amount of $20,000 as the Defendant does not have standing with respect to it. At this time, only Manni has standing to enforce this note. The Defendant had ample time to properly address this issue prior to trial. As a result, this Court will consider only the $79,590 promissory note issued by ARM in favor of the Defendant.
 THE APPLICABLE LAW
The parties' arguments require this Court to evaluate three chapters of the Rhode Island General Laws: Chapter 1 (General Provisions) and Chapter 9 (Secured Transactions — "Article 9") of Title 6A (Rhode Island's Uniform Commercial Code — the U.C.C.), and Chapter 25 (Execution), of Title 9 (Courts and Civil Procedure — Procedure Generally). Although not mentioned by either party, this Court notes at the outset that the statutory sections relied upon by the parties from the aforementioned laws have been amended at various times since the events underlying this case occurred in 1991 and 1992. E.g., compare G.L. 1956 (1985 Reenactment) §§ 6-1-103, 201 with G.L. 1956 (1992 Reenactment) §§ 6-1-103, 201; compare G.L. 1956 (1985 Reenactment) §§ 6A-9-101 to 6A-9-507 with G.L. 1956 (1992 Reenactment) §§ 6A-9-101 to 6A-9-507; and compare G.L. 1956 (1985 Reenactment) § 9-25-18 with G.L. 1956 (1997 Reenactment) § 9-25-18. Consequently, the parties' statutory citations should, but did not, have specifically included the appropriate year of the law at issue to properly notify this Court of same.
Therefore, this Court determined the specific statutory law at issue in this case — both the law upon which the parties relied and the law applicable to the facts of this case. This Court ascertained that the Plaintiff relies upon the 1992 Reenactment of Title 6A while the Defendant relies upon the 1997 Reenactment of Title 9.[2] For accuracy and clarity purposes, this Court herein includes the relevant year of the law relied upon by the parties. However, this Court finds that neither of the parties' versions of Rhode Island General Laws is applicable to the facts of this case.[3]
Rather, this Court finds the law applicable to this case is that which was in force at the time when the facts giving rise to this suit occurred. Specifically, the applicable law is that which was in effect from October of 1991 through July of 1992. In 1991, the following pertinent facts occurred giving rise to this case: in October of 1991 ARM defaulted on its obligations to Citizens; on November 19, 1991, Citizens took possession of the account receivable at issue; from May of 1991 to November of 1991 the Defendant purchased $113,237.67 worth of concrete from ARM and did not pay for it; on November 19, 1991 Citizens took legal possession of the account receivable collateral, including the owing and due $113,237.67 from the Defendant; some time between December 4, 1991 through the end of that year (if not through 1992), the Defendant made demand for payment under the promissory note issued to it by ARM in the amount of $79,590; and, on December 3, 1991, the Defendant received notification of the repossession and of the account receivable amount remaining due. In the following year, the following events occurred: some time from the start of the year (if not made previously in 1991) until March 4, 1992, the Defendant made demand for payment under the promissory note in the amount of $79,590; on July 6, 1992, Citizens legally sold ARM's account receivable to the Plaintiff. Given the timing of these facts, this Court concludes the law applicable in this case is embodied in the 1985 Reenactment and the 1991 Cumulative Supplement of Title 6A[4] and the 1985 Reenactment of Title 9.[5]
Despite the parties' improper statutory citations, this Court will examine the parties' arguments because this Court has determined that the difference between the applicable law and the law cited by the parties is inconsequential.[6] "In all relevant aspects, the laws are identical." Roland Whytock Co.,Inc. v. Wilson, 553 A.2d 1069, 1070 (R.I. 1989) (ruling on the merits of the case despite the failure of the parties to cite the law in force when the facts giving rise to the suit occurred). Although some of the sections of the applicable law relied upon in this decision have been amended subsequent to July of 1992, this Court finds such amendments irrelevant to this case as they do not provide for retroactive application.[7] In spite of the non-substantive difference between the applicable law and the cited law in this case, this Court chooses, for proper notice and legal accuracy, to evaluate the parties' arguments in light of the Rhode Island General Laws applicable to the facts of this case — those in force from October 1991 to July 1992 — and not pursuant to law provided by the parties. Contra id. at 1070 
n. 1, n. 2 (finding the law cited by the parties was in all relevant aspects identical to the law in force when the facts giving rise to the suit occurred, the Court chose to apply the law cited by the parties for purposes of clarity).
 THE DEFENDANT'S SET-OFF COUNTERCLAIM
The Defendant argues corporate successor liability is automatically imposed when successorship is found. The Defendant finds successorship exists because the Plaintiff admitted to being ARM's "successor in interest" in its pleadings; thus the Defendant maintains it does not need to prove successorship exists.
The Defendant believes the Plaintiff is liable for ARM's two promissory notes because it "[a]dmitted" twice in its Answers to the Defendant's Counterclaim that "[the Plaintiff] is the successor in interest to [ARM];" once seven years ago in the original pleadings, and again in the amended pleadings. Defendant's Counterclaim dated October 1996 and the Plaintiff's Answer thereto at ¶ 3; Defendant's Counterclaim dated October 2002 and the Plaintiff's Answer thereto at ¶ 3. The Defendant proffers the Plaintiff is obligated to its statement because parties are bound to their pleadings.
The Defendant argues the Plaintiff is automatically liable for ARM's debts and obligations based upon a dictionary definition of the phrase "successor in interest." The Defendant relies uponBlack's Law Dictionary's definition of successor in interest as: "[o]ne who follows another in ownership or control of property." This definition also provides "`[i]n order to be a `successor in interest,' a party must continue to retain the same rights as original owner without change in ownership and there must be change in form only and not in substance. . . ." Black'sLaw Dictionary 1431-32 (6th ed. 1990) (citing City of New Yorkv. Turnpike Development Corp., 233 N.Y.S.2d 887, 890 (N.Y. Sup.Ct. 1962)). From this definition, the Defendant argues it naturally follows that the Plaintiff is liable for its predecessor's promissory note obligations.
Given that set-off is well recognized and permitted in Rhode Island, even in the strictest of proceedings, such as bankruptcy, the Defendant maintains it is applicable here. Accordingly, the Defendant claims the promissory notes issued by ARM to the Defendant and Manni should be used to set off the amount of the account receivable due and owing to the Plaintiff. Relying upon G.L. 1956 (1997 Reenactment) § 9-25-18, regarding set-off, the Defendant seeks judgment in favor of the Plaintiff for no more than $13,647.67.
Alternatively, the Plaintiff argues the principle of set-off and the law of successor liability are inapplicable to this case. The Plaintiff contends it is well-settled in Rhode Island that the U.C.C., specifically Article 9 on secured transactions, governs the ownership interest of secured creditors (Citizens) in assets (such as ARM's account receivable) pledged as collateral. The Plaintiff finds the equitable right of set-off only exists when the transactions at issue are so intertwined that it would be inequitable to not allow the set-off, and that such a circumstance is not present here. The Plaintiff argues the security agreement establishing Citizen's interest in ARM's account receivable was entirely separate from the promissory note issued by ARM to the Defendant. Specifically, the Plaintiff points out that the promissory notes were issued by ARM in 1987 and 1989, respectively, which was some two-and-a-half years before the account receivable at issue came into existence as of May 1991.
The Plaintiff also claims it is not automatically liable for ARM's promissory notes because it did not assume such liability in its Answer. The Plaintiff claims it did no more than identify itself as the party who purchased ARM's account receivable. The Plaintiff contends the Defendant did not allege specifically in its Counterclaim that the phrase, "successor in interest," had a special meaning which included the assumption of ARM's liabilities. Therefore, the Plaintiff further claims it did not admit to successor liability in its Answer when it merely utilized the phrase, "successor in interest," to identify itself.
Additionally, the Plaintiff claims that its Answer, when considered in total, demonstrates that it denied any liability for ARM's promissory notes. According to the Plaintiff, the remainder of its Answer contains specific denials of any responsibility for ARM's liabilities under the promissory notes. In support of this argument, the Plaintiff emphasizes that party pleadings must be liberally construed by this Court. Therefore, the Plaintiff concludes that a liberal construction of its Answer in total indicates that it in no way assumed liability for ARM's promissory notes.
The Plaintiff therefore maintains the Defendant did not meet its burden of proof for successor liability in Rhode Island To the Plaintiff, the Defendant incorrectly states the theory of successor liability in Rhode Island The Plaintiff contends the general rule of successor liability in Rhode Island is that the successor entity is not responsible for the liabilities of the predecessor corporation; thus, successor liability is not automatically imposed when successorship is found. The Plaintiff claims the seminal case in Rhode Island on successor liability,H.J. Baker Bro., Inc. v. Orgonics, Inc., 554 A.2d 196 (R.I. 1989), supports this general rule. The Plaintiff contends the imposition of successor liability requires the Defendant to establish of an exception to the general rule. However, the Plaintiff claims the Defendant did not establish such an exception exists.
Acknowledging the importance of accurately crafted pleadings and recognizing that Rhode Island courts liberally construe party pleadings, this Court begins its analysis with the pleading phrase at issue: the phrase, "successor in interest." SeeGagnon v. State, 570 A.2d 656, 658 (R.I. 1990). The Plaintiff rests its entire successor liability argument upon the meaning of this phrase. Specifically, the issue is whether the Plaintiff's admission in its pleading that it was ARM's "successor in interest" is sufficient to automatically impose successor liability upon the Plaintiff. This issue is of first impression in Rhode Island
Foremost, this Court finds the Plaintiff's definition of the phrase, "successor in interest," incorrect. Relying upon a definition of the phrase in a non-authoritative legal reference (the Sixth Edition of Black's Law Dictionary), the Plaintiff contends the phrase includes per se liability for successor entities. However, the dictionary definition upon which the Plaintiff relies contains several broad meanings of the phrase, and none of these definitions provide for automatic successor liability. The most general of these definitions states that a "successor in interest" refers to "[o]ne who follows another in ownership or control of property." Black's Law Dictionary at 1431-32 (6th ed. 1990).
In accordance with this general definition of the phrase, this Court finds the Plaintiff's admission merely explains the general history of ownership of the accounts receivable at issue and not a party admission of successor liability. More significantly, the Plaintiff's entire Answer, when liberally construed, supports a finding that the Plaintiff did not assume liability for the Defendant's note. In paragraphs 15, 16, 17, 18, and 19 of its Answer, the Plaintiff claims it denied, in total, that it is responsible for the promissory notes from ARM to the Defendant in the amount of $79,590 and the promissory note from ARM to Manni in the amount of $20,000. Throughout its Answer, the Plaintiff repeatedly denied liability for ARM's promissory notes.
Additionally, the Defendant does not refer to any Rhode Island law to support its definition of the phrase "successor in interest." The phrase, "successor in interest," is used in numerous areas of law in the United States and its meaning is generally provided within a specific statutory framework. See
"Successor in interest," West's Words and Phrases, Volume 40C, 16-21 (2002). However, the "Definitions and index of definitions" section of the Code of Secured Transactions, G.L. 1956 (1985 Reenactment) § 6A-9-105, does not define "successor in interest."
Furthermore, the general rule of successor liability in Rhode Island provides that the successor entity is not automatically liable for its predecessor's debts. See, e.g., H.J. Baker Bro., Inc. v. Orgonics, Inc., 554 A.2d 196, 205 (R.I. 1989). This rule contradicts the Defendant's argument that successor liability may attach automatically. In order to establish successor liability in Rhode Island, a Defendant must overcome this no-liability rule by proving an exception applies. Id.
Admitting to being a "successor in interest" for identification purposes is not such an exception. In Ed Peters Jewelry Co.,Inc., the First Circuit listed the following four exceptions wherein liability may be imposed on a successor corporation:
 "[a]n acquiring corporation may become liable under the successor liability doctrine for the divesting of the corporation's outstanding liabilities if one of four exceptions is met: 1) an express or implied assumption the divesting entity's debts; 2) the parties structured the asset divestiture to effect a de facto merger of the two corporations; 3) the divesting corporation transferred its assets with actual fraudulent intent to avoid, hinder or delay its creditors; or 4) the acquiring corporation is a `mere continuance' of the divesting corporation." 124 F.3d 252, 266 (1st Cir. 1997).
The Rhode Island Supreme Court has only recognized one of these four exceptions, the "mere continuation" exception. SeeCranston Dressed Meat Co. v. Packers Outlet Co., 57 R.I. 345, 348, 190 A. 29, 31 (1937).
The mere continuation exception applies when a new company "is merely the continuation or reorganization of another and the business or property of the old corporation has practically been absorbed by the new. . . ." Id. If such facts are present, the new company will be held responsible for the old company's debts.Id. To determine whether the new company is merely a continuation of the old original entity, this Court must examine the facts and circumstances of this case. Id. at 349, 190 A. at 31. The Rhode Island Supreme Court has adopted the following criteria for determining whether there is a mere continuation, if:
 "1. there is a transfer of corporate assets;
 2. there is less than adequate consideration;
 3. the new company continues the business of the transferor;
 4. both companies have at least one common officer or director who is instrumental in the transfer; and
 5. the transfer renders the transferor incapable of paying its creditors because it is dissolved either in fact or by law."
 H.J. Baker Bro., Inc. v. Orgonics, Inc., 554 A.2d 196, 205 (R.I. 1989) (citing Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186, 196, 241 A.2d 471, 477 (1968)); see also Ed Peters Jewelry Co., Inc., v. C J Jewelry Co., Inc., 124 F.3d 252, 268 (1st Cir. 1997); Casey v. San-Lee Realty Inc., 623 A.2d 16, 18-9 (R.I. 1993).
Failing to prove two of these four factors is insufficient proof of successor liability under this exception. See John T.Callahan Sons, Inc. v. Dykeman Electric Co., Inc., 266 F. Supp.2d 208, 224 (D. Mass. 2003) (failing to prove that the consideration was inadequate and that the transfer of assets renders the transferor incapable of paying its creditors). Moreover, failing to prove even one of these factors was fatal in establishing liability for debt under the "mere continuation" exception. See Ed Peter Jewelry Co., Inc. v. C J Jewelry,Inc., 51 F. Supp.2d 81, 93 (D.R.I. 1999). Considering all of these factors, this Court finds only the first factor satisfied: the assets of ARM were sold to the Plaintiff. As four of the five factors were not met, this Court finds successor liability is not established based upon the "mere continuation" exception.
The Defendant also fails to prove the "de facto merger" exception. "When a de facto merger is alleged, the court must determine `the substance of the agreement [regardless of] the title put on it by the parties.'" Kleen Laundry and Dry Cleaningv. Total Waste Management, 817 F. Supp. 225, 230 (D.N.H. 1993) (citing In re Acushnet River New Bedford Harbor, 712 F. Supp. 1010, 1015 (D. Mass. 1989)). A court "may hold the surviving corporation liable for the conduct of the transferor corporation if the parties have achieved `virtually all the results of a merger,' even if they have not observed the statutory requirements of a de jure merger." Id. "The de facto merger doctrine is a judge-made rule that rests on general equitable principles." Id. Courts consider four factors for determining if this exception is met:
 "1. [t]hat there was a continuation of the enterprise of the selling corporation vis a visa a continuation of management, personnel, physical location, assets, and general business operation;
 2. [t]hat there is a continuity of shareholders resulting from the purchase of the assets with shares of stock, rather than cash;
 3. [t]hat the selling corporation ceases operations, liquidate, or dissolves as soon as possible; and
 4. [t]hat the purchasing corporation assumes the obligations of the selling corporation necessary for uninterrupted continuation of business." Kleen Laundry and Dry Cleaning v. Total Waste Management, 817 F. Supp. 225, 230-31 (D.N.H. 1993) (quoting In re Acushnet River New Bedford Harbor, 712 F. Supp. 1010, 1015 (U.S. Dist. 1989) (citations omitted)).
Here, ARM ceased operating well in advance of the sale of the assets from Citizens to the Plaintiff in July of 1992, and did so not because of an intent to merge, but because it defaulted on its obligations to its primary creditor.
Finally, the Defendant provides no evidence that the other exceptions — the transfer of assets with actual fraudulent intent to avoid, hinder, or delay its creditors, and the express or implied assumption of debts — apply. Rather, the evidence establishes unequivocally that the purchase was carried out in good faith by both Citizens and the Plaintiff in accordance with the law of Rhode Island See Stipulated Facts 29 and 33. Citizens repossessed and then sold the assets of ARM because ARM defaulted on its obligations to Citizens under the original loans. The Plaintiff purchased the collateral from Citizens for adequate consideration and for value. See Stipulated Facts 28. In addition, the Plaintiff and Citizens acted in good faith concerning the negotiations for and purchase and sale of these assets. See Stipulated Facts 30 and 31. Citizens provided valid and legal notice of the sale of the collateral to the Defendant and ARM and the sale was commercially reasonable. See
Stipulated Facts 29, 32, and 33.
The Defendant provides no evidence establishing that any exception applies to overcome the no-liability rule of successor liability. Viewing all the facts and circumstances disclosed by the parties in this case, and applying to them the principles of law previously set out, this Court concludes that the facts and law support a finding that the law of successor liability and set-off do not apply to this case.
 THE PLAINTIFF'S U.C.C. CLAIMS
Based on Article 9 of the U.C.C. (Chapter 9, Secured Transactions, of Title 6A, the U.C.C, of the Rhode Island General Laws), the Plaintiff finds the Defendant liable for the entire $113,237.67 due and owing on ARM's account receivable.[8]
The Plaintiff maintains it is well settled in Rhode Island that the U.C.C. governs the ownership interest of secured creditors in assets pledged as collateral, including accounts receivable.See G.L. 1956 (1992 Reenactment) §§ 6A-1-102 (a) and (b). As such, the Plaintiff claims Citizens' ownership in the account receivable is governed by Article 9 and refers to sections of the U.C.C. regarding both set-off and liability.
The Plaintiff contends that the provisions of Title 6A displace the principles of law and equity. The Plaintiff argues the exclusion in G.L. 1956 § 6A-9-104(i), regarding set-off, should be interpreted narrowly and in accordance with the majority of other jurisdictions' interpretations. The Plaintiff contends such an interpretation should only exempt holders of rights of set-off from the filing provisions of the Code and not exempt such holders from the priority provisions of the U.C.C. Under such an interpretation, the Plaintiff claims the rights of set-off are not preserved if the priority provisions of the U.C.C. dictate otherwise. Accordingly, the Plaintiff maintains the priority provisions of G.L. 1956 (1992 Reenactment) § 6A-9-318 govern because the ownership interest of a secured party in an account receivable is at issue.
Specifically, the Plaintiff claims subsection (b) of G.L. 1956 (1992 Reenactment) § 6A-9-318 applies. The Plaintiff finds the Defendant's set-off Counterclaim did not arise out of the account debt — the account receivable in the amount of $113,237.67. Rather, the Plaintiff claims the Defendant's Counterclaim arose from the promissory note between ARM and the Defendant, a separate contract unrelated to the account receivable. The Plaintiff finds the Defendant's defense of set-off arose out of a promissory note signed by ARM in favor of the Defendant on January 15, 1989; it did not arise out of the account debt at issue. Instead, the Plaintiff maintains the account debt at issue arose out of the sale of concrete from ARM to the Defendant approximately two years after the promissory note was signed. Applying subsection (b), the Plaintiff contends the Defendant's set-off Counterclaim is only valid if its promissory note accrued before the Defendant received notification of the assignment of the account receivable from ARM to Citizens.
The Plaintiff relies upon the U.C.C.'s definition notice to establish that the Defendant was aware of the assignment before its right of set-off accrued. To the Plaintiff, a corporation like the Defendant is deemed to have "received notification" of an assignment of a security interest when an officer of that corporation has actual knowledge of the assignment, even if the officer acquired the knowledge in his/her capacity as an officer of another corporation. The Plaintiff argues that the Defendant received notice through its President, Manni, in Manni's capacity as president of ARM. Manni signed the security agreement assigning the security interest in the account receivable from ARM to Citizens on August 27, 1987.
As a result, the Plaintiff argues, Manni had actual knowledge of the security interest on that date, as did the Defendant, since Manni was the president of the Defendant at the time of his signing. As such, the Plaintiff concludes the Defendant received notification of this assignment by virtue of the fact that their president, Manni, had personal knowledge of this fact and an officer's (Manni's) knowledge can be imputed to their corporation (Defendant). The Plaintiff maintains the Defendant's promissory note did not come into existence until a year-and-a-half after this notification, when the promissory note was signed on January 15, 1989. Moreover, the Plaintiff points out that this promissory note did not accrue until demand was made on it by the Defendant some four years after it received notification of the assignment, some time between December 4, 1991 and March 4, 1992.
As such, the Plaintiff finds the Defendant clearly received notification of the assignment of the security interest in present and future accounts receivable by ARM to Citizens before the Defendant's right of set-off, pursuant to the promissory note in the amount of $79,590, accrued. Thus, the Plaintiff contends the Defendant cannot use the promissory note to set off the account receivable because Citizens took valid and legal possession of the account receivable owed to ARM in the amount of $113,237.67 free and clear of the promissory note given by ARM to the Defendant in the amount of $79,590.
Additionally, the Plaintiff argues Citizens sold the account receivable in the amount of $113,237.67 to the Plaintiff free and clear of the Defendant's promissory notes for two reasons. First, Citizens sold to the Plaintiff the same rights it had in the account receivable to the Plaintiff. Second, the Plaintiff argues the promissory note in the amount of $79,590 from ARM to the Defendant is subordinate to the security interest held by Citizens in the account receivable in accordance with G.L. 1956 (1992 Reenactment) § 6A-9-504 because this promissory note was not secured by the account receivable in question. Applying G.L. 1956 (1992 Reenactment) § 6A-9-504, the Plaintiff concludes it purchased the account receivable in the amount of $113,237.67 free from the Defendant's subordinate lien. The Plaintiff notes that other jurisdictions have interpreted section 504 similarly and would not elevate an unsecured general creditor's claim above that of a perfected secured creditor.
This Court finds Article 9 of the U.C.C., pertaining to secured transactions, applies to the facts of this case. Article 9, embodied in Chapter 9 of Title 6A in Rhode Island General Laws, applies to a security interest in an account receivable.[9]
Given most states have adopted the U.C.C. and that "comparable provisions with identical wording, or at least substantive meaning, exist in most of the various state statutory schemes," this Court looks to its sister states' interpretations of U.C.C. for guidance in interpreting the sections of the Code pertinent in this case. 4447 Associates v. First Security Financial,889 P.2d 467, 472 n. 7 (Utah App. 1995).
In general, the U.C.C. displaces other principles of law, providing as follows:
 "Section 6A-1-103. Supplementary general principles of law applicable. — Unless displaced by the particular provisions of title 6A, the principles of law and equity, including the law of merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause shall supplement its provisions." (1985 Reenactment).
However, according to G.L. 1956 (1985 Reenactment) §6A-9-102(1),[10] Article 9 is subject to the exclusions located in G.L. 1956 (1985 Reenactment) § 6A-9-104. As section 104(i) contains an exclusion providing that Article 9 does not apply "to any right of set-off," this Court must foremost determine the application of this exclusion. G.L. 1956 (1985 Reenactment) § 6A-9-104(i).
The Priority Provisions of Article 9 Apply to Set-off Rights
The breadth of the exclusion in section 104(i) has not yet been addressed by Rhode Island case law. Other jurisdictions' interpretations of section 104(i) vary. Some interpret this provision broadly; others interpret it narrowly. Compare,e.g., State Bank v. First Bank, 320 N.W.2d 723, 725 (Minn. 1982) (interpreting the section broadly) with InsleyManufacturing Corp. v. Draper Bank Trust, 717 P.2d 1341, 1344 (Utah 1986) (interpreting the section narrowly). When considering this same issue, the Supreme Court of Utah, succinctly explained both interpretations as follows:
 "A small minority of jurisdictions and some commentators construe 9-104(i) broadly, taking the position that the provision excludes all situations concerning set-offs, not only from the Code's security and filing provisions, but also from the Code's priority provisions . . . A majority of jurisdictions have construed section 9-104(i) narrowly to mean that a right of set-off may exist in a creditor who fails to comply with the security agreement and filing provisions of article nine, but that the section 9-104(i) exclusion does not extend to the Code's priority provisions." Insley, 717 P.2d at 1344 (Utah 1986) (internal citations omitted).
This Court interprets section 104(i) of the Rhode Island Code in accordance with the majority of other jurisdictions, finding justification already set forth for such an interpretation compelling. See, e.g., Continental American Life InsuranceCo. v. Griffin, 251 Ga. 412, 414, 306 S.E.2d 285, 287 (1983);Citizens National Bank of Whitley County v. Mid-StatesDevelopment Co., 177 Ind. App. 548, 556, 380 N.E.2d 1243, 1248 (1978); The Morris Plan Co. of St. Joseph v. Broadway NationalBank of Kansas City, 598 S.W.2d 557, 560 (Mo. Ct. App. 1980);Associates Discount Corp. v. Fidelity Union Trust Co.,111 N.J. Super. 353, 357-58, 268 A.2d 330, 332 (1970); First WisconsinNational Bank of Milwaukee v. Midland National Bank,76 Wis.2d 662, 251 N.W.2d 829, 833 (1977). See also Sec. 9-104-10: Rights of set-off, Article 9: Secured Transactions, HawklandLord Lewis Uniform Commercial Code Series (West Group Pub. 2001).
While the language of section 104(i) appears to bar the complete application of the Article 9 — both its filing and priority provisions — to any right of set-off, this Court finds such a broad interpretation unwarranted given the narrow purpose of section 104(i)'s exclusion and the treatment of set-off elsewhere in Code. Professor Gilmore, a principal reporter for Article 9, explained, that the purpose of section 104(i) is limited to a bank's right of set-off against a depositor's account. Professor Gilmore stated as follows:
 "This exclusion is an apt example of the absurdities which result when draftsmen attempt to appease critics by putting into a statute something that is not in any sense wicked but is hopelessly irrelevant. Of course a right of set-off is not a security interest and has never been confused with one: the statute might as appropriately exclude fan dancing. A bank's right of set-off against a depositor's account is often loosely referred to a `banker's lien,' but the `lien' usage has never led anyone to think that the bank held a security interest in the bank account. Banking groups were, however, concerned lest someone, someday, might think that a bank's right of set-off, because it was a lien, was a security interest. Hence the exclusion, which does no harm except to the dignity and self-respect of the draftsmen." G. Gilmore, Security Interests in Personal Property, 315-6 (1965); see also Insley, 717 P.2d at 1344.
Accordingly, section 104(i) was established so that banks did not need to comply with Article 9 to create a right of set-off.[11] Given the narrow purpose of the section 104(i), this Court also considers it "unsound to read [section 104(i)] as removing transactions in the commercial arena from the Code whenever the priority of a set-off is involved." Insley,
717 P.2d at 1345.
Further support for this interpretation of section 104(i) is found elsewhere in the U.C.C. For example, for two other exclusions listed in section 104 — the mechanic's liens and liens for services (section 104(c)), and judgment lienor (section 104(h)) — the drafters of the Code spelled out specific priority provisions for them elsewhere in the Code. Id.; see, e.g.,
G.L. 1956 (1985 Reenactment) § 6A-9-301(b), 310. Arguably, therefore, the drafters of the Code would have also spelled out specific priority provisions for set-offs elsewhere in the Code if they had intended to exclude set-offs from the Code's priority provisions. Insley, 717 P.2d at 1345. However, no express priority provisions exist in the Code "suggesting a perfected security interest is subordinate to a right of setoff." Id.
Other provisions the Code would be unnecessary if the draftsmen intended a broad construction of section 104(i). For instance, section 306(4)(d)(i), G.L. 1956 (1985 Reenactment) §6A-9-306(4)(d)(i), expressly subjects a perfected security interest in specific proceeds to any right of set-off in the event of an insolvency proceeding. If section 104(i) had a broad implication, all perfected security interests "would be equally subject to any right of set-off," and this section would be repetitive and superfluous. See id. Consequently, this Court finds the Defendant's right of set-off is subject to the Code's priority provisions.
The Applicable Priority Provisions of the Code: Section 318(b)
This Court applies the priority provisions of the Code applicable to an assigned account receivable (the collateral at issue in this case). The applicable section is G.L. 1956 (1985 Reenactment) § 318. Section 318 establishes the rules governing an assignee's priority position relative to the account debtor and the assignor. See Sec. 9-318: In general, Article 9:Secured Transactions, Hawkland Lord Lewis Uniform CommercialCode Series (West Group Pub. 2001). The rules in section 318 "operate any time there has been a sale or assignment of an account or chattel paper, or any time there has been an assignment of a general intangible as collateral." Id.
Specifically, the account debtor is the "person who is obligated on an account, chattel paper or general intangible." G.L. 1956 (1985 Reenactment.) § 6A-9-105(1)(a). The assignor or debtor is "the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts, or chattel paper." G.L. 1956 (1985 Reenactment) § 6A-9-105(1)(b). The assignee or secured party is "a leader, seller, or other person in whose favor there is a security interest, including a person to whom accounts, or chattel paper have been sold." G.L. 1956 (1985 Reenactment) § 6A-9-105(1)(c). In this case, the Defendant is the account debtor, ARM is the assignor, and Citizens is the assignee. Specifically, ARM assigned its existing and future account receivable to Citizens, which included the account receivable in the amount of $113,237.67 due and owing by the Defendant.
Under Rhode Island's U.C.C., the relevant priority rules are located under section 318(1), G.L. 1956 (1985 Reenactment) §6A-9-318(1). In general, "[s]ection 9-318(1) concerns the extent to which an assignee takes subject to the terms of the contract assigned and claims and defenses that may exist in favor of the account debtor." Sec. 9-318:1: In general, Article 9: SecuredTransactions, Hawkland Lord Lewis Uniform Commercial CodeSeries (West Group Pub. 2001). Section 318(1) contains two priority rules, under subsections (a) and (b), providing as follows:
 "Section 6A-9-318. Defenses against assignee — Modification of contract after notification of assignment — Certain contract terms ineffective — Identification and proof of assignment. — (1) Unless an account debtor has made an unenforceable agreement not to assert defenses or claims arising out of a sale as provided in § 6A-9-206 the rights of the assignee are subject to
 (a) All the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and
 (b) Any other defense or claim of the account debtor and assignor which accrues before the account debtor receives notification of the assignment." (1985 Reenactment).
Over the years, courts have distinguished the application of the rules in each subsection of section 318 based upon the source of the account debt. The courts have treated claims and defenses differently depending upon whether they arise from the security agreement or from other contracts. See, e.g., In re Apex OilCo., 975 F.2d 1365, 1368-69 (8th Cir. 1992) (interpreting Tex. Bus. Comm. Code Ann. § 9.318(a)(1),(2) — the equivalent of G.L. 1956 (1985 Reenactment) § 6A-9-318(1)(a), (b)). If the claim or defense arises from the security agreement, courts have applied subsection (1)(a); however, if the claim arises from other contracts, courts have applied subsection (1)(b). Id.
In other words, under subsection (1)(a) "an account debtor can assert claims and defenses based upon the terms of the contract whether they arise before or after notification of an assignment. However, subsection (1)(b) limits assertion of unrelated claims and defenses to those `which accrue before the account debtor receives notification of the assignment.'" 4447 Associates v.First Security Financial, 889 P.2d 467, 472 (Utah Ct. App. 1995) (interpreting Utah Code Ann. §§ 70A-9-318(1)(a), (b) (1990) which corresponds to G.L. 1956 (1985 Reenactment) § 6A-9-318(1)(a), (b)). See Sec. 9-318:1 In general, Article 9: SecuredTransactions, Hawkland Lord Lewis Uniform Commercial CodeSeries (West Group Pub. 2001).
This Court finds the Defendant's set-off Counterclaim arose from its contract with ARM and not from the security agreement between ARM and Citizens regarding the account receivable at issue. Therefore, this Court finds subsection (1)(b) governs and the Defendant's set-off Counterclaim can only be successful if it accrued before the Defendant received notice of the existence of the assignment of the account receivable to Citizens.
Rhode Island's U.C.C. defines notice as follows:
 "Section 6A-1-201. General definitions. — Subject to additional definitions contained in the subsequent chapters of this title which are applicable to specific chapters thereof, and unless the context otherwise requires, in this title:
 . . .
 (25) A person who has "notice" of a fact when
 (a) He has actual knowledge of it; or
 (b) He has received a notice or notification of it; or
 (c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.
 A person "knows" or has "knowledge" of a fact when he has actual knowledge of it. "Discover" or "learn" or a word or phrase of similar import refers to knowledge other than to reason to know. The time and circumstances under which a notice or notification may cease to be effective are not determined by this title. G.L. 1956 (1991 Cum. Supp.) § 6A-1-201(25).
Furthermore, under subsection (26), one "notifies or gives notice or notification by
 taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when
 (a) It comes to his attention; or
 (b) It is duly delivered at the place of business through which the contract was made or at any other public place held out by him as the place for receipt of such communications." G.L. 1956 (1985 Reenactment) § 6A-1-201(26).
"Subsection (1)(b) does not specify a particular form of notice, but simply precludes an account debtor from raising a claim or defense against an assignee after the account debtor is aware that the assignment exists." 4447 Associates, 889 P.2d at 473 (internal citations omitted) (interpreting Utah's equivalent section of the U.C.C.).
The Defendant received such notice when Manni, in his capacity as president of ARM, signed the security agreement assigning the security interest in the account receivable from ARM to Citizens on August 27, 1987. As Manni was the president of the Defendant at the time of his signing, this Court determines that the Defendant had actual knowledge of the security interest on the date of Manni's signing. See, e.g., Jay Group, Ltd. v.Glasgow, 139 N.C. App. 595, 601 (N.C. App. 2000) ("[k]nowledge of the president or agent of a corporation is imputed to the corporation itself."). However, the Defendant's Counterclaim defense did not accrue until some time between December 4, 1991 and March 4, 1992, when the Defendant demanded payment on the promissory note issued by ARM. This is at least four years after the Defendant had notice of Citizen's assignment. Moreover, the Defendant actually had notice of the assignment for about two years before ARM issued the $79,590 promissory note to the Defendant on January 15, 1989.
Therefore, this Court finds the Defendant's set-off Counterclaim accrued after the Defendant had notice of Citizen's assignment in ARM's account receivable. Since the Defendant's Counterclaim does not meet the requirement of section 318(b), Citizen repossessed the account receivable at issue free and clear of the Defendant's promissory note. This Court finds Citizens sold these same rights in the account receivable — free and clear of the $79,590 promissory note — to the Plaintiff when Citizens sold the collateral to the Plaintiff for adequate consideration and value.
Section 504 of the U.C.C., G.L. 1956 (1985 Reenactment) §6A-9-504, also makes clear that the Plaintiff purchased the account receivable free and clear of the Defendant's promissory note. This section governs the Plaintiff's rights and interests as a third-party purchaser, providing as follows:
 "Section 6A-9-504. Secured party's rights to dispose of collateral after default — Effect of disposition. —
 . . .
 (4) When collateral is disposed of by a secured party after default, the disposition transfers to the purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this party or of any judicial proceedings
 (a) In the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or
 (b) In any other case, the purchaser acts in good faith."
 (1985 Reenactment) (Emphasis added).
Pursuant to this section, when Citizens disposed of the account receivable after ARM's default, the disposition "discharge[d] the security interest under which it is made and any security interest or lien subordinate thereto." As the Defendant's promissory note was not secured by the account receivable at issue, it was subordinate to Citizen's perfected security interest in the account receivable. Accordingly, the Plaintiff purchased the account receivable free from the Defendant's subordinate lien. See, e.g., Liqui Lawn Corp. v. TheAndersons, 509 N.E.2d 1236 (Ohio 1987) (finding the collateral repossessed by a perfected secured party was sold free and clear of the promissory note of an unsecured general creditor, in accordance with Ohio's equivalent of section 504 of Article 9).
 CONCLUSION
For the aforementioned reasons, based upon this Court's findings of fact and conclusions of law, this Court enters judgment in favor of the Plaintiff in the amount of $113,237.67. The Plaintiff owns the account receivable in the amount of $113,237.67 free and clear of the promissory note issued by ARM to the Defendant in the amount of $79,590. The Defendant cannot use this promissory note to set off the account receivable due and owing to the Plaintiff. This note is neither valid nor enforceable against the Plaintiff. Pursuant to the Consent Decree, this Court will conduct an evidentiary hearing to decide the rate of interest to be added to the judgment.
Counsel shall submit appropriate judgment for entry in accordance with this decision.
[1] These are the exact issues provided to this Court by the parties in their Consent Decree. Based upon these issues, it appears as though both of the parties sought this Court's determination whether the Plaintiff owns the account receivable free and clear of the promissory note issued by ARM in favor of Manni in the amount of $20,000. However, the parties disagree over whether the Defendant has standing on this note since this note was issued to Manni as an individual and not to the Defendant.
[2] As the parties provided supporting law that was copied from the print sources of the Rhode Island General Laws, this Court was able to confirm the year of the law relied upon by comparing the page numbers provided in the supporting law to the page numbers listed in the Rhode Island General Laws in print.
[3] The Plaintiff's supporting statutory law is inapplicable to this case because it did not become effective until after the controlling facts of this case occurred. The Plaintiff's supporting law — the 1992 Reenactment of Title 6A — became effective on December 31, 1992 whereas the last fact relevant to this case occurred on July 6, 1992 when Citizens sold the account receivable at issue to the Plaintiff. See P.L. 1992, ch. 324, § 1, 18. The applicable law therefore is embodied in the 1985 Reenactment and the 1991 Cumulative Supplement of Title 6A.
Similarly, the Defendant's supporting statutory law — only section 9-25-18 of the 1997 Reenactment of the Rhode Island General Laws — is inapplicable to the facts of this case also because it became effective after 1992. See Publisher's Note,Reenactment of 1997, Title 9, at iii (Michie 1997) (relying upon the December 31, 1997 effective date of the 1997 Reenactment because the version of G.L. § 9-25-18 cited by the Defendant came into effect with the 1997 Reenactment and not by a legislative amendment).
[4] The 1992 Cumulative Supplement to Title 6A is not referenced as none exists. A Notice Card in the pertinent 1992 Cumulative Supplement provides that no 1992 Pocket-Part Supplement was prepared for Title 6A because the 1992 Reenactment of Title 6A contains all the legislation affecting Title 6A as passed by the General Assembly through its January 1992 session. However, the 1992 Reenactment did not become effective until December of 1992. Thus, the 1992 Reenactment does not apply to the facts of this case which transpired from October of 1991 to July of 1992, and the law pertinent to the facts of this case is embodied in the 1985 Reenactment of Title 6A and the 1991 Cumulative Supplement to Title 6A. All but one section of Title 6A cited in this opinion requires citation to the 1985 Reenactment of Title 6A because only one section of Title 6A cited in this opinion was altered between the 1985 Reenactment and the 1991 Cumulative Supplement: G.L. § 6A-9-201(25) (changing "title 6A" to "this title").
[5] This Court does not cite to the 1992 Supplement to Title 9 as the text of section 9-25-18 did not change subsequent to the 1985 Reenactment of Title 9.
[6] The sections of Title 6A to which the Plaintiff cites from the 1992 Reenactment vary only slightly from those same sections in the applicable law. The 1992 Reenactment of Title 6A made minor capitalization, stylistic, and punctuation changes to Title 6A, modifying the Code only slightly from its embodiment in the 1985 Reenactment and the 1991 Cumulative Supplement. Compare
G.L. 1956 (1985 Reenactment 1991 Supp.) §§ 6A-1-103, 6A-1-201,6A-9-102, 6A-9-104, 6A-9-318, and 6A-9-504 with G.L. 1956 (1992 Reenactment) §§ 6A-1-103 (inserting a comma), 6A-1-201 (inserting a colon, changing capitalization, adding a paragraph designations, making stylistic and minor punctuation changes throughout), 6A-9-102 (making minor punctuation changes throughout), 6A-9-104 (adding a colon and making stylistic changes throughout), 6A-9-318 (adding a colon), and 6A-9-504
(making minor punctuation changes throughout).
The one section of Title 9 to which the Defendant cites from the 1997 Reenactment varies insignificantly from the applicable 1985 Reenactment of that section. The changes to this section between these versions of the law are minor — capitalization, stylistic, punctuation, and rephrasing. More importantly, these changes were inconsequential because they were not made by a legislative amendment. See History of Section, G.L. 1956 (1997 Reenactment) § 9-25-18, at 477 (revealing the section had not been amended since 1956). Thus, the changes embodied in G.L. 1956 (1997 Reenactment) § 9-25-18 must have been made pursuant to the general authority given to the compiler ("office of law revision") to "rearrange, rephrase, and consolidate the public laws and acts and resolves of the general assembly so that redundancies may be avoided, obsolete enactment eliminated, contradictions reconciled, omissions supplied, and imperfections cured." G.L. § 22-11-3.4; see also Oliviera v. Lomardi,794 A.2d 453, 457-58 n. 3 (R.I. 2002); Kingstown Mobile Home Park v.Strashnick, 774 A.2d 847, 861-862 (R.I. 2001) (J. Flanders, dissenting and concurring). As the compiler did not notify the general assembly of these changes for their approval, the changes to the law must be immaterial. See G.L. § 43-4-18(a). "[I]n the absence of an explicit amendment by the Legislature, [the statute] means today exactly what it did before the [1992] reenactment, and that no legal significance should be given to the language that altered the [Code]." Oliveira v. Lombardi,794 A.2d 453, 457 n. 3 (R.I. 2002).
[7] The law upon which the Defendant relies, G.L. § 9-18-25, has not been amended since the 1997 Reenactment. See 1997 Reenactment 2003 Supp. of G.L. § 9-18-25. Thus, this Court finds there is no retroactivity issue when this Court employs the applicable 1985 Reenactment of section 9-25-18 to the facts of this case. Conversely, this Court determines that the law upon which the Plaintiff relies has been amended several times since to 1992. However, this Court determined that these amendments do not have retroactive application, and therefore these amendments do not apply to the facts of this case. Compare G.L. 1956 (1985 Reenactment 1991 Cum. Supp.) §§ 6A-1-103, 201, and 6A-9-102, 104, 318, 504 with G.L. 1956 (2001 Reenactment 2003 Supp.) §§6A-1-103, 201, and 6A-9-102, 104, 318, 504.
According to the Rhode Island Supreme Court, a court normally "presumes that statutes and their amendments operate prospectively unless there is clear, strong language or a necessary implication that the General Assembly intended to give the statute retroactive effect." Direct Action for Rights andEquality v. Gannon, 819 A.2d 651, 658 (R.I. 2003); see Pionv. Bess Eaton Donuts Flour Co., 637 A.2d 367, 371 (R.I. 1994). The U.C.C. sections applicable in this case (embodied in the 1985 Reenactment and the 1991 Supplement) which differ from the current law constituting those same sections (embodied in the 2001 Reenactment and 2003 Supplement) are as follows: G.L. §§6A-1-201, 6A-9-102, 6A-9-104, 6A-9-318, 6A-9-504. The amendments to these U.C.C. sections subsequent to the 1992 Amendments cited by the Plaintiff (which were already determined to be substantially the same as the applicable law in footnote 6) neither provide clear, strong retroactive language nor necessitate retroactive application. Rather, the legislature created specific, prospective effective dates for them. The Public Laws passed in 2000 and 2002 amending these U.C.C. sections all provide as follows: "[t]his shall take effect on July 1, 2001" or "effective upon passage [June 6, 2002]." P.L. 2000, ch.182 § 6, 13 (amending sections 6A-9-102, 104, 318, 504), P.L. 2000, ch. 182, § 7, 13 (amending section 6A-1-201), P.L. 2000, ch.238, § 5,7 (amending section 6A-1-201), P.L. 2000, ch. 420 § 6,13 (amending sections 6A-9-102, 104, 318, 504), P.L. 2000, ch. 420 § 7, 13 (amending section 6A-1-201), P.L. 2000, ch. 421, § 5, 7 (amending section 6A-1-201), P.L. 2002, ch. 244, § 1, 2 (amending section 6A-9-102); see Title 6A of Rhode Island General Laws (2001 Reenactment 2003 Supp.). Therefore, this Court presumes that the amendments reflected in the current Code only apply prospectively and do not retroactively apply to the facts of this case which occurred in 1991 and 1992.
The current Rhode Island U.C.C. also cannot be applied retroactively because these subsequent amendments to the sections at issue in this case are not remedial in nature. See id.;see Direct Action for Rights and Equality v. Gannon,819 A.2d 651, 658 (R.I. 2003). "When . . . a statute lacks such clear, strong language or there is no necessary implication concerning its retroactive application, the distinction between a substantive statute and a remedial, or procedural, statute becomes important." 819 A.2d at 658; see Pion v. Bess EatonDonuts Flour Co., 637 A.2d 367, 371 (R.I. 1994). "Substantive statutes, which create, define, or regulate substantive legal rights, must be applied prospectively"; however, "remedial and procedural statutes, which do not impair or increase substantive rights but rather prescribe methods for enforcing such rights, may be construed to operate retroactively." 819 A.2d at 658. These amendments significantly altered substantive legal rights and were not merely of a remedial and procedural nature; thus, they must be applied prospectively. E.g., compare G.L. 1956 (1992 Reenactment) § 6A-9-318 with G.L. 1956 (2001 Reenactment) § 6A-9-318 (drastically changing the title and content of the section).
[8] The Defendant mentions the U.C.C. only generally and briefly in its arguments, without citing a specific section of Article 9. The Defendant argues that the Rhode Island General Laws do not change the applicability of the theory successor liability to this case and that the sale of ARM's account receivable to the Plaintiff did not, and cannot, extinguish the debt owed to the Defendant under the promissory notes.
[9] Rhode Island General Law 1956 (1985 Reenactment) § 6A-9-102
provides as follows:
 "6A-9-102. Policy and subject matter of chapter. — (1) Except as otherwise provided in § 6A-9-104 on excluded transactions, this chapter applies
 (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts and also
 (b) To any sale of accounts, or chattel paper.
 (2) This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. This chapter does not apply to statutory liens except as provided in § 6A-9-310.
 (3) The application of this chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this chapter does not apply."
[10] Id.
[11] In accordance with this interpretation, the HawklandUniform Commercial Code Series provides that a bank's right of set-off was excluded by section 104 for the following reasons:
 "[The] right [of set-off], chiefly (if not exclusively) exercised by banks, is often more descriptively called a banker's lien and arises in favor of a bank because of its unique position relative to its depositors. When a customer deposits money into a bank account, the customer becomes a creditor of the bank, and the bank becomes its debtor. When the customer obtains credit from the bank, both the bank and the customer are debtors and creditors of one another. Since the bank, even if it does not have possession of the customer's money, has the ready ability to prevent withdrawals and in effect gain possession of the monies in the bank account if the customer fails to repay its obligation to the bank, the bank can effectively setoff the customer's obligation against its own obligation to return monies deposited in the bank account. And, just as other common-law or statutory lien rights are excluded from Article 9's coverage, so too is the common-law or statutory right of setoff.
 In large measure, the drafters excluded the right of setoff from Article 9 because both the creation of the right of setoff and its exercise are nonconsensual and neither the bank nor its customer intends to create a security interest in the customer's bank account." Sec. 9-104-10: Rights of set-off, Article 9: Secured Transactions, Hawkland Lord Lewis Uniform Commercial Code Series (West Group Pub. 2001) (internal citations omitted).